**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Alberto MEJIA, Defendant–Appellant.**

**No. 87–4120.**

United States Court of Appeals,
Fifth Circuit.

April 25, 1988.

Rehearing and Rehearing En Banc
Denied July 6, 1988.

---

26. *Hill,* 106 S.Ct. at 369–70.

27. *Id.* at 370.

28. *See Id.* at 371.

29. 21 U.S.C. § 960; 21 U.S.C. § 841.

Michael J. Osman, Miami, Fla., for defendant-appellant.

John A. Broadwell, Asst. U.S. Atty., Joseph S. Cage, Jr., U.S. Atty., Shreveport, La., for plaintiff-appellee.

Before THORNBERRY, WILLIAMS and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Alberto Mejia appeals a judgment of conviction on a four-count indictment relating to the importation and distribution of a large quantity of cocaine. We affirm.

## I.

The government's indictment charged that Alberto Mejia, under the cover of a cattle export business, engaged with others

in a criminal enterprise to import large amounts of cocaine into the United States. The government indicted and tried Mejia on counts of (1) conspiracy to import 1,197 pounds of cocaine from Panama, in violation of 21 U.S.C. §§ 952(a), 963; (2) aiding and abetting that importation, violating 21 U.S.C. § 952(a), 18 U.S.C. § 2; (3) conspiracy to distribute the cocaine, abridging 21 U.S.C. §§ 841(a)(1), 846; and (4) attempt to possess the cocaine with intent to distribute, contrary to 21 U.S.C. §§ 841(a)(1), 846. A jury found Mejia guilty on all four counts, and the trial judge sentenced him to an aggregate twenty-five year term of imprisonment followed by a mandatory three-year special parole term. Mejia appeals his conviction on two grounds. First, he charges that the evidence presented by the government was insufficient to support his conviction. Second, Mejia challenges the district court's exclusion of testimony from his Miami attorney as hearsay. The facts will be discussed below in more detail when we consider each of appellant's assignments of error.

## II.

Mejia's principal challenge on appeal is that the evidence is insufficient to convict him. He presents two distinct arguments. First, he contends that the standard of review for sufficiency of the evidence claims announced in *United States v. Bell*, 678 F.2d 547, 549 (5th Cir.1982) (en banc), *aff'd*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983), may not be applied retroactively to an offense committed before the *Bell* decision. Second, Mejia argues that, under any standard, the government's evidence of his guilt is insufficient to support his conviction.

## A.

■ Mejia first addresses the proper standard we should use to assess his claim that the government presented insufficient evidence to support the jury's conviction. He argues that the more recently announced, less stringent standard announced in *Bell* may not be applied retroactively to crimes committed before the date of the *Bell* decision. *Bell* requires us to view the evidence in the light most favorable to the verdict and affirm if the verdict is supported by substantial evidence. Mejia contends that his case must be reviewed according to a stricter, pre–*Bell* standard, which required reversal unless we determine that the trier of fact could reasonably have found that the evidence excluded every reasonable hypothesis except that of guilt. *See, e.g., United States v. Squella–Avendano*, 478 F.2d 433, 437 (5th Cir.1973); *United States v. Warner*, 441 F.2d 821, 825 (5th Cir.), *cert. denied*, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971).

Mejia bases this argument on the Constitution's prohibition against application of ex post facto laws, U.S. Const. art. I, § 9, cl. 3. Mejia's argument is meritless. The Supreme Court has made it clear that "no *ex post facto* violation occurs if the change in the law is merely procedural and does 'not increase the punishment, nor change the ingredients of the offense or the ultimate acts necessary to establish guilt.'" *Miller v. Florida*, — U.S. ——, 107 S.Ct. 2446, 2452–53, 96 L.Ed.2d 351 (1987) (quoting *Hopt v. Utah*, 110 U.S. 574, 590, 4 S.Ct. 202, 210, 28 L.Ed. 262 (1884)).

A change in the standard of review is properly characterized as procedural rather than substantive because it neither increases the punishment nor changes the elements of the offense or the facts that the government must prove at trial. *See id.* We have consistently applied *Bell* to criminal conduct that occurred before the *Bell* decision was announced. *E.g., United States v. Vergara*, 687 F.2d 57 (5th Cir. 1982); *United States v. Sudderth*, 681 F.2d 990 (5th Cir.1982); *United States v. Hartley*, 678 F.2d 961 (5th Cir.1982), *cert. denied*, 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983).

## B.

■ Having determined our standard of review, we now consider the substance of Mejia's claim that the record evidence is insufficient to support his conviction. For

this purpose we accept the evidence in the light most favorable to the verdict. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

The government sought to prove that Mejia participated in an elaborate scheme to fly large quantities of cocaine from Panama to New Iberia, Louisiana under the cover of a cattle exporting business. The initial steps to start the cattle exporting business from New Iberia, Louisiana airport were taken by John Reyes. Reyes asserted that he represented Panama Inexport, a company interested in exporting Brahman cattle from Louisiana to Panama. He made preliminary arrangements with the New Iberia airport officials to export cattle.

In April of 1982, Reyes contacted Carlos Herrera, an employee of the Fair Air charter cargo airlines, for assistance in chartering an airplane for cattle shipments to Panama. Reyes explained that shipments would originate in New Iberia, Louisiana, because, Reyes contended, Louisiana cattle had a better reputation than Florida or Texas cattle. Reyes declined Herrera's suggestion that the cattle could be transported much cheaper if they were trucked to Miami and flown to Panama from there. Reyes arranged for five back-to-back flights from New Iberia to Panama at $30,000 per flight.

Reyes next contacted a cattle dealer, Gordon Guilliot, and preliminarily arranged for him to purchase cattle for Panama Inexport. Reyes informed Guilliot that a company representative, Alberto Mejia, would conduct all future business transactions for Inexport. Guilliot and Mejia eventually purchased cattle in Texas and Florida and trucked them to Louisiana for shipment to Panama. Guilliot testified that Mejia knew very little about buying cattle.

The first thirty-seven head of cattle were flown from New Iberia to Panama on May 6. The company's Panamanian contact, Jorge Baena, told the flight crew that the Panamanian Customs officials refused the cattle because they were improperly vaccinated, and the cattle were flown back to New Iberia. The United States veterinari-

an who prepared the cattle for export testified that the cattle had been properly vaccinated and the Panamanians had no reason to refuse them. The government portrayed this trip as a dry run designed to test what control the conspirators would have over the cargo during off-loading in Panama.

A second shipment of fifty head of cattle was prepared for export on May 17. In addition to the cattle, the crew loaded forty fifty-pound sacks of feed, one bundle of plastic feed sacks, and two cardboard boxes containing stitching machines. Though Mejia argued that the plastic bags were required to protect the feed from moisture, the government presented evidence that this practice was unusual as well as unnecessary. The feed was stored in a dry facility before being loaded into the cargo area of the airplane, which was also completely dry. Mejia himself went to the feed store with Jaime Castillo, Mejia's translator and business partner, to purchase these bags. It was the only time he accompanied Castillo on these errands. Mejia also personally saw that the feed bags and stitching machines were on the airplane; he helped move them to the front of the plane to balance the load before takeoff.

This shipment of cattle was successfully unloaded in Panama, but the feed bags were not. Baena explained to the flight engineer that the Panamanians had rejected the bags of feed because they were wet. When the plane returned from Panama on May 18, Mejia, Castillo, and others were waiting at the airport in New Iberia. Before the plane landed, Mejia told one of the workmen at the New Iberia livestock facility that he was going into town to pick up feed for the next load of cattle. Mejia never bought the feed, and though unindicted for some two years, was not seen again until shortly before his trial.

Customs agents arrived at the airport shortly after the plane landed. Their search of the airplane revealed 490 small packages of cocaine stuffed into the feed bags. Each feed bag was inside one of the plastic bags Mejia had purchased in Lafayette, and the top of each plastic bag was

stitched closed. The 490 smaller packages of cocaine weighed 1,197 pounds; the cocaine was sixty to ninety-seven percent pure, with an estimated street value of $50,000,000.

When federal agents searched the residence in St. Martinville, Louisiana, that Mejia shared with Castillo, they found the house in disarray. Mejia's clothes and other personal items had been left behind. In Castillo's bedroom, the agents found several pages of hand written Spanish describing in great detail Panama Inexport's mission in Louisiana. The government argues that this document, introduced as Government Exhibit No. 50, was a script for the Colombians to follow while they were in Louisiana—a means for the players to keep their cover stories straight. The document generally described the purpose of Panama Inexport and gave a detailed account of its personnel. For example, its second paragraph reads, "[Panama Inexport's] general manager is Mr. John Reyes, about sixty-five years old, of medium height, always well dressed in a tie and jacket, very polite and well-mannered." The document provided that Mejia "will be the direct representative of Panama Inexport, and in turn he will act as the inspector of the cattle to be received.... This way Mr. Mejia will always be together with Mr. Gordon Guillot [sic]. ..." The document directed Mejia to hire two cowboys from Panama to go with him to prepare the cattle.

> People should get used to seeing the cowboys around the plane and the quarantine section, and if possible to cultivate the personnel working in quarantine. Mr. Mejia should take on the role of boss and coordinator and be above doing manual labor.... It is very important to ask Mr. Guillot [sic] for some decals and labels like the ones on his cars so that it will blend in with his. It is important that the cowboys always go in the truck and Mejia in the car.

The document further provided that the cowboys should ask Guilliot to take them into town to buy cowboy clothes and hats as soon as they arrived.

The latter part of the document, entitled "Secondary Line of Recovery," outlined alternative escape plans. The document stated that Mejia was a sugar mill technician and had a plane nearby to enable him to obtain parts for a "very important repair." The document further identified a "passive secondary" in the event of strange activity by Customs, such as more Customs officials than usual when the flight is about to arrive or the presence of dogs. In this event, the document advised "it is better to leave fast." Finally the document listed an "alternate secondary," which directed the conspirators to bribe the most suitable of the government personnel.

Mejia argues that the government presented no evidence of his knowledge of Exhibit No. 50. We conclude, however, that the jury could reasonably have concluded that Mejia's behavior sufficiently conformed to that prescribed in Exhibit No. 50 that he was following the script and was a knowing participant in the conspiracy. Though Mejia's behavior did not follow the script to the smallest detail, it did comport with the outline the document prescribed. For instance, Mejia played the role of the boss—he paid for everything the workers or the company needed, he stayed above manual labor, and he hired the cowboys. In addition, Mejia's flight from the airport facility before the plane's arrival conformed precisely to the document's "passive secondary" plan of escape.

In addition to the inferences the jury was entitled to make from Government Exhibit No. 50, the jury was permitted to draw several other inferences from the evidence.

First, the nonsensical way Panama Inexport chose to conduct its business, which seemed to guarantee financial disaster, supports the government's argument that the company was a sham and existed for some purpose other than exporting cattle for profit. These abnormal, cost-enhancing business practices included trucking cattle from Texas and Florida to the remote New Iberia, Louisiana airport instead of flying the cattle directly from Houston and Miami to Panama. In addition, the company shipped the cattle very inefficiently.

Though the aircraft's cargo capacity was approximately 110 cattle, Panama Inexport sent only thirty-seven cows on the first trip and only fifty on the second. Considering the $30,000 cost of each flight, such inefficient use of the plane's cargo capacity significantly increased the company's cost basis in each animal.

Second, the fact that the New Iberia airport was chosen over Houston or Miami, against Panama Inexport's economic interest, supports the government's contention that the smugglers wished to conduct their business in an area where Customs inspectors would be less likely to inspect their cargo thoroughly. Third, Mejia's involvement with the plastic bags is highly incriminating. The smugglers used these bags and stitching machines to enclose the resacked feed and help conceal the cocaine. Mejia bought these items himself and assisted in redistributing them on the plane. The clerk who sold Mejia the bags testified that, in his fifteen years of experience, this was the only time anyone had requested plastic protection for feed bags. He testified further that Mejia was his first and only customer to purchase a stitching machine. The jury was entitled to find that the only plausible reason Mejia had to purchase these materials and place them on the aircraft was to conceal the cocaine.

Fourth, Mejia followed other suspicious business practices on behalf of his company in regularly paying cash for large purchases. Although Mejia opened a checking account with a New Iberia bank, he paid $7,000 cash when he bought a used one-ton pick-up truck for the cowboys; he gave Gordon Guilliot $25,000 cash to buy cattle, and he paid cash for rental cars. The jury was entitled to infer that Mejia dealt in such large amounts of cash to avoid creating a paper trail of his activities and that a legitimate business would not have followed these practices.

Finally, the jury was entitled to consider as highly incriminating Mejia's flight from the airport shortly before the Customs agents inspected the aircraft. This is particularly true in light of the evidence that he left his clothes and other personal belongings behind, relinquished plans to seek citizenship, abandoned the cattle export business, and left $13,904.70 in a checking account at the New Iberia National Bank. The physical items were later recovered by Mejia's attorney; Mejia declined to re-enter the jurisdiction.

■ When all this evidence is considered together, it amply supports the verdict; the trial court did not err in entering judgment on it.[1]

### III.

■ Mejia also argues that the trial court improperly excluded testimony from his Florida counsel on grounds that it was hearsay. About two weeks after the cocaine was seized, Mejia asked attorney David O'Leary to help him retrieve the property he had left in Louisiana. At trial, Mejia sought to have O'Leary relate statements Mejia made to him in that meeting to rebut the government's contention that his flight from Louisiana indicated a guilty conscience. Mejia argues that he was entitled to present evidence of an innocent state of mind as an exception to the hearsay rule under Federal Rule of Evidence 803(3).[2] Whatever the merit of Mejia's argument, his trial attorney failed to preserve this issue for appeal because he did not argue this hearsay exception to the trial court. "We have long held that, ab-

---

1. Mejia argued for the first time in his reply brief on appeal that Exhibit No. 50 should not have been admitted into evidence because it was hearsay. Because Mejia neither objected to this evidence at trial nor assigned its admission as error in his opening brief, we do not consider his argument. *See Mississippi River Corp. v. Federal Trade Comm'n*, 454 F.2d 1083 (8th Cir. 1972); *Finsky v. Union Carbide & Carbon Corp.*, 249 F.2d 449 (7th Cir.), *cert. denied*, 356 U.S. 957, 78 S.Ct. 993, 2 L.Ed.2d 1065 (1957).

2. Federal Rule of Evidence 803 provides, in pertinent part:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(3) *Then existing mental, emotional, or physical condition.*—A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition. . . .

sent a showing of manifest injustice, a litigant may not raise a theory on appeal that was not presented to the district court." *United States v. Jackson,* 700 F.2d 181, 190 (5th Cir.) (citations omitted) (defendant-appellant could not argue on appeal that testimony was not hearsay because it was not offered to prove the truth of the matter asserted when he did not argue this theory to the trial court), *cert. denied,* 464 U.S. 842, 104 S.Ct. 139, 78 L.Ed.2d 132 (1983).

 Even if the district court should have allowed O'Leary to relate Mejia's statements to the jury, the failure to do so was at most harmless error because it was cumulative of O'Leary's other testimony. The court allowed O'Leary to testify about what activities he undertook on Mejia's behalf; the jury could infer that O'Leary took these steps at Mejia's request. O'Leary further testified that Mejia was upset about the discovery of the cocaine. Mejia has failed to proffer what additional facts he intended to introduce through O'Leary's testimony, so we are unable to evaluate Mejia's requested relief on grounds that O'Leary's testimony should have been admitted pursuant to Federal Rule of Evidence 803(3).

In the alternative, Mejia argues that the statement was not hearsay at all because it was not introduced to prove the truth of the matters asserted. This issue, too, defense counsel failed to raise to the trial court; it is therefore beyond our reach on appeal. *See id.* Accordingly, we find no error in the district court's exclusion of this defense testimony.

### IV.

Because the government presented sufficient evidence to the jury to support their guilty verdicts, and because the trial court committed no error in excluding hearsay defense testimony, the judgment of the trial court entered on the jury's verdict is affirmed.

AFFIRMED.