# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1897

_____

|  |  |  |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri |
| Phillip O'Malley, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted:   December 18, 2003

Filed:   April 22, 2004

_____

Before MELLOY, McMILLIAN, and BOWMAN, Circuit Judges.

_____

McMILLIAN, Circuit Judge.

The United States of America (hereinafter the government) appeals from a final judgment entered in the United States District Court for the Western District of Missouri following its criminal prosecution of Phillip O'Malley, who was found guilty by a jury of conspiring to commit bank, wire, and mail fraud, in violation of 18 U.S.C. §§ 371, 1341, 1343, and 1344. After determining O'Malley's applicable range of imprisonment under the sentencing guidelines to be 24 to 30 months, the district court sentenced O'Malley to three years of probation with no term of imprisonment and ordered O'Malley to pay $459,047.02 in restitution, a $10,000.00 fine, and a $100.00 special assessment. United States v. O'Malley, No. 01-5022-03-CR (W.D.

Mo. Mar. 4, 2003) (Judgment). For reversal, the government argues that the district court erred at sentencing in (1) determining the relevant amount of financial loss to the victim and (2) departing from the sentencing guidelines. For the reasons stated below, we vacate O'Malley's sentence and remand the case to the district court for further proceedings consistent with this opinion.

## Jurisdiction

Jurisdiction was proper in the district court based upon 18 U.S.C. § 3231. Jurisdiction is proper in this court based upon 18 U.S.C. § 3742(b) and 28 U.S.C. § 1291. The notice of appeal was timely filed pursuant to Fed. R. App. P. 4(b).

## Background

On July 27, 2001, O'Malley, the owner and operator of several businesses in Pittsburg, Kansas, along with Paul Doyon and Marc Lininger, business development managers for Sam's Club Membership Warehouses (hereinafter Sam's Club), were charged in the district court in a three-count indictment. Count I of the indictment alleged that, in 1996, O'Malley, Doyon, and Lininger jointly participated in a conspiracy to commit fraud in the sales and distribution of chlorofluorocarbon gases, commonly known as freon. Counts II and III of the indictment were subsequently dismissed and are not at issue in the present appeal.

Doyon pled guilty and was sentenced to two years imprisonment. Lininger also pled guilty and agreed to testify for the government against O'Malley. Lininger's sentencing was postponed until after O'Malley's trial.

At O'Malley's trial, the government's evidence showed the following. During the relevant time period, Sam's Club was a large volume purchaser and distributor of freon. Business development managers for Sam's Club were responsible for

-2-

marketing Sam's Club products to large volume purchasers. Ordinarily, large volume purchases and sales by Sam's Club were controlled by its purchasing and sales department. However, because of the volatility of the freon market, Sam's Club allowed some large volume purchases and sales of freon to be controlled by its business development managers at the local level. Lininger and Doyon were among the business development managers who were permitted to have such control. Lininger and Doyon arranged with O'Malley for Sam's Club to purchase freon from one or more of O'Malley's companies at inflated prices. Lininger, Doyon, and O'Malley also arranged transactions in which one of O'Malley's companies would purchase freon from Sam's Club and then sell it to a third party at a higher price. O'Malley would give Lininger and Doyon each a share of his profits (i.e., kickbacks), which they referred to as "commissions." Sam's Club had no knowledge of this scheme involving O'Malley, Lininger, and Doyon.

The jury found O'Malley guilty of conspiracy to commit bank, wire, and mail fraud, as alleged in Count I of the indictment.

Pursuant to the district court's instructions, a probation officer prepared a presentence investigation report (PSR) for O'Malley.[1] According to the PSR, the

---

[1]In preparing O'Malley's presentence investigation report, the probation officer used the 1995 version of the sentencing guidelines. The district court and the parties have similarly assumed that the 1995 version of the guidelines applies in the present case. Section 1B1.11 of the 2002 version of the sentencing guidelines provides in pertinent part: "The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced," except that, "[i]f the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the *ex poste facto* clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed." In the present case, application of the 2002 Guidelines Manual, which was in effect at the time of O'Malley's sentencing hearing, would result in a higher sentence than application of the 1995 version, which was in effect at the time of the

difference between the amount O'Malley paid for the relevant quantities of freon and the amount for which he sold the same quantities of freon equaled $756,460.00. Of that sum, O'Malley retained $277,412.98, Doyon and Lininger each received $229,523.51, and three unindicted co-conspirators received $20,000 altogether. The PSR concluded that the amount of the loss to the victim was $459,047.02, which represented the sum of Doyon's and Lininger's gains from the conspiracy.[2] The PSR further concluded that O'Malley's total offense level was 17, his criminal history category was I, and his resulting sentencing range was 24 to 30 months. The PSR recommended restitution in the amount of $459,047.02.

The parties filed objections to the PSR, which were addressed at O'Malley's sentencing hearing.[3] On the question of the amount of the victim's loss, the government argued that the loss to Sam's Club should include, not just the kickbacks received by Doyon and Lininger, but all of the co-conspirators' ill-gotten gains – for a total loss of $756,460.00.[4] The government maintained, and the district court acknowledged, that the findings made at Doyon's sentencing hearing were not

offense. Under the 2002 Guidelines Manual, USSG § 2B1.1, a crime of fraud with an amount of loss between $400,000 and $1,000,000 results in an adjusted base offense level of 20. Without any additional offense level adjustments, O'Malley's sentencing range under the 2002 guidelines would be 33 to 41 months.

[2]The PSR noted that the district court had already ruled at Doyon's sentencing hearing that the amount of the loss to the victim was $459,047.02.

[3]O'Malley and Lininger were sentenced at the same hearing on March 4, 2003. Because Lininger had cooperated with the government and agreed to testify against O'Malley, he received a sentence of probation under USSG § 5K1.1.

[4]In its written objections, the government argued that the amount of loss should be $736,460.00. However, the government corrected its position at the sentencing hearing and argued for a $756,460.00 loss figure, which included the $20,000.00 in kickbacks paid to the three unindicted co-conspirators. See Sentencing Transcript at 3.

binding for purposes of sentencing O'Malley. The government also asserted that, if the loss figure were to be increased, O'Malley's restitution, offense level, sentencing range, and fine range should also be increased accordingly.

In his written objections to the PSR, O'Malley expressly noted that he did not dispute the PSR's factual account of the relevant transactions; however, he did dispute the characterization of any financial gain to him, Doyon, or Lininger as a "loss" to Sam's Club. At the sentencing hearing, O'Malley argued that the loss figure should be no more than $459,047.02, but also again suggested that "even the payment of $459,047.02 overstates the seriousness of the offense because there is no indication that that was a loss to Sam's Club, particularly in a dollar-for-dollar amount." Sentencing Transcript at 5.

Upon consideration, the district court held that, for all relevant sentencing purposes including restitution, the amount of the loss to Sam's Club was $459,047.02. See id. at 6-7.

After ruling on the issue of the loss to the victim, the district court next considered whether a downward departure was warranted, as requested by O'Malley. At that time, O'Malley's attorney called the district court's attention to character letters that the defense had previously submitted to the district court. In addition, defense counsel presented for the first time a letter dated February 25, 2003, from T.A. Dunham, the President of Gold Bank, to James R. Hobbs, O'Malley's attorney (hereinafter the "Gold Bank letter"), which stated in relevant parts:

Dear Mr. Hobbs,

This letter is to inquire as to the terms of remitting restitution to the Clerk of the Court in Springfield, Mo. on behalf of our customer Philip O'Malley. We recognize that this matter is under the jurisdiction of a Federal Court and the Presiding Judge will ultimately make the decision

as to the disposition of Mr. O'Malley's case. However, as Mr. O'Malley's counsel we would like to point out to you certain concerns the bank feels very strongly about with respect to funding our customer's request.

1.　It is imperative in our judgment that Mr. O'Malley receive a probated sentence if he borrows these funds in order to manage his businesses and liquidate certain properties necessary to reduce his outstanding loans from the bank to a manageable level. . . .

2.　As certain real estate properties will need to be liquidated to repay this additional debt, . . . the bank is concerned that if Phil is incarcerated, potential buyers of these properties in our small community will believe there is a sense of urgency in selling these properties and tender below market offers.

3.　We feel it is necessary to require that Mr. O'Malley receive a probated sentence to fund this credit facility under the terms and conditions of our commitment.

Sincerely,

T.A. Dunham, Community Bank President - Pittsburg

The Gold Bank letter and the character letters were then collectively marked as Defendant's Exhibit 1.[5]

---

[5]As stated above, the Gold Bank letter had not previously been submitted to the district court, although the character letters had been. Defense counsel explained: "And I have with me, Judge, the original of the letter from Gold Bank. At the time we submitted letters to the Court, we had not yet received that original." Sentencing Transcript at 8.

Thereafter, defense counsel argued that a downward departure was warranted based upon extraordinary restitution, as well as the adverse economic impact that O'Malley's incarceration would have on the community. The government responded by arguing that neither of these two factors identified by O'Malley, whether considered alone or in combination, warranted a downward departure. The government argued that the payment of restitution at that point was not extraordinary and should, at most, be considered under the sentencing guidelines as a possible ground for finding acceptance of responsibility. As a policy matter, the government emphasized, a white collar defendant's payment of restitution should not influence the sentencing court to depart downward.

At the close of both parties' arguments on the issue of downward departure, defense counsel stated:

> [A]t this time I would like to tender to the Court Exhibit 1 that has the original letter from Mr. Dunham of Gold Bank along with the other letters as well as attached to it with a paper clip is a cashier's check paid to the Clerk of the Court, remittor Phil O'Malley, on Gold Bank in the amount of $459,047.02.

Sentencing Transcript at 21.

As indicated above, the district court determined that O'Malley's applicable sentencing range under the guidelines was 24 to 30 months, but departed from the guidelines and sentenced O'Malley to three years of probation, with no prison term. The district court explained:

> [P]ursuant to USSG 5K2.0 [this case is] outside the heartland based upon[:] 1) the extraordinary restitution effort of the defendant to take out a loan to pay restitution immediately; 2) the seriousness of defendant's role is overstated; 3) Pittsburg, Kansas, being a small farming community, the Court recognizes the economic impact and importance

of keeping defendant's business operating and the provision of employment for over 60 people in the community.

United States v. O'Malley, No. 01-5022-03-CR (W.D. Mo. Mar. 4, 2003) (Statement of Reasons). This appeal followed.

## Discussion

*Amount of loss*

The government argues that the district court clearly erred in determining that the amount of financial loss to Sam's Club resulting from O'Malley's offense was the total amount of Doyon's and Lininger's kickbacks, $459,047.02, instead of the full amount of money retained by all of the co-conspirators, $756,460.00. The government acknowledges that it bore the burden of proof on this issue. However, the government contends that it met its burden by introducing evidence, based upon records kept by O'Malley himself, showing the amount of money received by each of the co-conspirators in each of their unlawful transactions. As a consequence of the district court's improper valuation of the loss, the government argues, O'Malley was permitted to retain the $277,412.98 he obtained through his criminal conduct. That result, the government argues, is contrary to the well-established principle that a criminal offender should not be permitted to profit from his or her crime. See, e.g., United States v. Whatley, 133 F.3d 601, 606 (8th Cir.) ("We are not inclined to allow the defendants a profit for defrauding people or a credit for money spent perpetrating a fraud."), cert. denied, 524 U.S. 940 (1998). Addressing the district court's apparent effort to be consistent with its prior sentencing of co-defendant Doyon, the government contends that Doyon's restitution order was erroneous, and now the district court has simply repeated the error. The government also argues that it is not a defense to say that the victim nevertheless retained an objectively fair profit. The government explains that, under such circumstances, the victim is harmed by the

denial of full and honest disclosure, which would have permitted it to benefit even more. Thus, the government concludes, the measure of harm must be the benefit that all of the co-conspirators reaped as a result of their unlawful scheme.

In support of the district court's finding regarding the amount of the loss, O'Malley notes that, under the guidelines (currently USSG § 2B1.1 and formerly USSG § 2F1.1), the loss determination need not be exact, but may be a reasonable estimate of the victim's loss based upon the available evidence. O'Malley argues that, because the prosecution's theory was an "intangible rights theory of mail and wire fraud," the payments made to Doyon and Lininger accurately reflected the value of Sam's Club's loss of honest services from its employees. O'Malley further argues that, because it was not unlawful for him simply to make a business profit, the profit he made was not part of the relevant loss. He also argues that, under the guidelines and interpretive case law, the actual gain incurred by a defendant ordinarily is not the proper measure of the loss to the victim and should only be used as an alternative estimate of the loss where it cannot otherwise be calculated. Turning to the cases cited by the government, O'Malley distinguishes them on grounds that they involved more egregious wrongdoing and did not involve an "intangible rights theory," as in the present case. For example, he argues, in United States v. Whatley, 133 F.3d at 606, this court rejected the defendant's argument that the amount of loss should exclude the cost of running the business in question because the *entire* business was based upon a fraud. By contrast, he argues, his businesses were themselves not illegal or fraudulent, only certain transactions were. Therefore, he concludes, the profits incurred by his businesses were legitimate and should not be treated as part of Sam's Club's loss under the guidelines.

We review the district court's determination of the amount of loss to the victim for clear error. United States v. Oligmueller, 198 F.3d 669, 671 (8th Cir. 1999). We argree with the government that allowing O'Malley or his companies to retain the profits incurred from his unlawful conspiracy with Doyon and Lininger would

improperly permit him to benefit from his illegal conduct. His profits were part of Sam's Club's losses. For example, where Lininger and Doyon arranged for Sam's Club to sell freon through one of O'Malley's companies to a third party and O'Malley received a middleman's profit (which he shared with his co-conspirators), the amount of loss to Sam's Club was the entire profit retained by all the co-conspirators, including O'Malley; absent the fraud, Doyon and Lininger arguably could have arranged a direct sale from Sam's Club to the third party buyer at the same price, and Sam's Club would have retained the entire profit for itself. Similarly, where Doyon and Lininger conspired with O'Malley for O'Malley to purchase freon from a third party and then sell the same freon to Sam's Club at a profit (a profit which the co-conspirators secretly kept for themselves), Sam's Club arguably was denied the benefit of buying the freon at O'Malley's purchase price and thus was improperly deprived of the net profit shared by the co-conspirators, including O'Malley. Therefore, the amount of loss suffered by Sam's Club as a result of the conspiracy should have included all the funds retained by all of the co-conspirators as a result of their fraudulent scheme, and the district court's finding to the contrary was clearly erroneous. The total amount of Sam's Club's loss was $756,460.00.

*Downward departure*

"Under the PROTECT Act of 2003, Pub. L. No. 108-21 § 401, 117 Stat. 650, 657 (2003), amending 18 U.S.C. § 3742(e) effective April 30, 2003, we review de novo the issue of whether a departure is justified given the particular facts of a case." United States v. Hutman, 339 F.3d 773, 775 (8th Cir.), cert. denied, 124 S. Ct. 842 (2003). The de novo standard of review applies to pending appeals, even where the defendant was sentenced before the effective date of the PRTOECT Act, because a change in the review standard is procedural in nature. United States v. Gonzales-Ortega, 346 F.3d 800, 802 (8th Cir. 2003) ("Although [the defendant] was sentenced before the PROTECT Act became law, the Act, because it is procedural in nature, does apply to his pending appeal."); United States v. Hutman, 339 F.3d at 775

(quoting United States v. Mejia, 844 F.2d 209, 211 (5ᵗʰ Cir. 1988)) ("A change in the standard of review is properly characterized as procedural rather than substantive [and therefore can be applied to a pending appeal without violating the Ex Post Facto clause] because it neither increases the punishment nor changes the elements of the offense or the facts that the government must prove at trial.").

As stated above, the district court set forth three reasons for its decision to depart from the guidelines: (1) O'Malley's extraordinary restitution effort in taking out a bank loan to pay full restitution immediately; (2) the view that the seriousness of O'Malley's role in the offense had been overstated under the guidelines; and (3) the economic impact on the community if O'Malley were to be absent from his businesses, which employed over 60 residents of Pittsburg, Kansas, a small farming community.

In support of the determination that his restitution effort was extraordinary, O'Malley maintains that the cashier's check, which was tendered to the district court before its decision to depart, was fully and immediately negotiable regardless of what the district court's sentencing decision would be.[6] O'Malley also emphasizes that his payment of restitution relieved Doyon and Lininger of their joint and several liability. O'Malley cites United States v. Oligmueller, 198 F.3d at 672, for the proposition that his restitution effort justified the downward departure in the present case. O'Malley further argues that departure for extraordinary restitution is appropriate in the present case because "[o]therwise, there is no incentive for a defendant to make such substantial and extraordinary effort." He concludes that even a sentence at the low

_____

[6]O'Malley maintains: "The Gold Bank letter simply asks the district court to consider probation. This letter indicates in part that '[w]e recognize that this matter is under the jurisdiction of the Federal Court and the Presiding Judge will ultimately make the decision as to the disposition of Mr. O'Malley's case.' The Bank is simply asking the Court to impose probation." Brief for Appellee at 26-27.

end of his guideline sentencing range would not "adequately distinguish or award [sic] such extraordinary efforts." Brief for Appellee at 29.

The district court, in its statement of reasons, suggested that O'Malley's actions were extraordinary because of the extensive borrowing efforts and financial commitment he was required to make in order to obtain such a sizable bank loan prior to the sentencing hearing. The district court expressly noted "the extraordinary restitution effort of the defendant to take out a loan to pay restitution immediately." We, too, recognize that O'Malley must have gone to great lengths to have a cashier's check for $459,047.02 readily available for tender at the sentencing hearing. However, to treat such efforts as warranting a downward departure from the guidelines would differentiate criminal defendants on the basis of their economic resources, which is clearly contrary to the intent of the sentencing guidelines.

Moreover, voluntary payment of restitution is a mitigating circumstance that has been taken into consideration by the Sentencing Commission in formulating the guidelines. Application note 1(c) to USSG § 3E1.1 expressly recognizes that a downward adjustment for acceptance of responsibility may be applicable if the defendant voluntarily paid restitution prior to the adjudication of his or her guilt. Therefore, the district court was authorized to depart from the guidelines based upon O'Malley's restitution efforts only if, "in light of unusual circumstances, the guideline level attached to that factor is inadequate." USSG § 5K2.0; see also United States v. Garlich, 951 F.2d 161, 163 (8th Cir. 1991) (district court erroneously concluded that it lacked authority to consider the defendant's voluntary payment of restitution before his adjudication of guilt; "[i]f the district court determines the two-level reduction for acceptance of responsibility inadequately addresses [the defendant's] restitution, the district court may impose a reasonable sentence outside the guideline range").

While litigating in the district court, O'Malley argued that any restitution amount was inappropriate because Sam's Club suffered no real financial loss, a

position he maintained right up to the point of the district court's ruling on the amount of the loss. See Sentencing Transcript at 5. Only after that decision was made did O'Malley tender the cashier's check to pay restitution. Under these circumstances, while O'Malley certainly had a right to dispute the amount of the loss to Sam's Club, his payment of restitution after his guilt was adjudicated and after the amount of the loss was determined did not qualify as acceptance of responsibility under the guidelines, much less a basis for downward departure.

Furthermore, contrary to O'Malley's argument, the downward departure in the present case is not justified under United States v. Oligmueller. In that case, we held that the amount of the loss resulting from the defendant's fraudulent attainment of a bank loan should reflect the full amount fraudulently borrowed, without consideration of the defendant's efforts to repay the bank after the fraud was discovered (except for payments from the sale of pledged assets); however, we further held that the district court did not abuse its discretion in departing downward because the amount of the loss significantly overstated the risk to the bank and because the defendant – *having voluntarily begun making restitution almost a year before he was indicted* – had engaged in extraordinary restitution efforts. See 198 F.3d at 671-72.

Thus, the only remaining question with respect to "extraordinary restitution" is whether the downward departure is justified on that basis because O'Malley's full payment of restitution relieved his co-defendants of their joint and several liability for the same loss. We hold that it is not. Joint and several liability is no less liability. The downward departure cannot be justified by the fact that O'Malley's immediate fulfillment of his own legal obligation bestowed a benefit upon his co-conspirators.

We next turn to the district court's second reason for departing downward – that "the seriousness of defendant's role is overstated." As a procedural matter, we note that O'Malley did not identify this factor as a ground for departure nor did the

district court notify the parties that it was contemplating departure on this basis, as required under Fed. R. Crim. P. 32(h) ("Before the court may depart from the applicable sentencing range on a ground not identified for departure either in the presentence report or in a party's rehearing submission, the court must give the parties reasonable notice that it is contemplating such a departure."); see also Burns v. United States, 501 U.S. 129, 138-39 (1991) ("[B]efore a district court can depart upward on a ground not identified as a ground for upward departure either in the presentence report or in a prehearing submission by the Government, Rule 32 requires that the district court give the parties reasonable notice that it is contemplating such a ruling. This notice must specifically identify the ground on which the district court is contemplating an upward departure."); id. at 135 n.4 ("It is equally appropriate to frame the issue as whether the *parties* are entitled to notice before the district court departs upward *or* downward from the Guidelines range. Under Rule 32, it is clear that the defendant and the Government enjoy equal procedural entitlements."). Therefore, under the procedural circumstances of the present case, the district court lacked authority to depart from the guidelines on the ground that the seriousness of O'Malley's role in the offense had been overstated.

Because of the possibility that the procedural defect discussed above could be corrected on remand, we will now address this second factor on its merits. A defendant's minimal or minor role in the offense is a factor considered in the guidelines. See USSG § 3B1.2 (downward adjustments of 2 to 4 levels for minor to minimal participation in the criminal activity). Thus, the question once again is whether, "in light of unusual circumstances, the guideline level attached to that factor is inadequate." USSG § 5K2.0. In the present case, the probation officer did not recommend a downward adjustment based upon O'Malley's mitigating role in the offense, nor did O'Malley object to the PSR for its lack of such a recommendation. Nevertheless, because O'Malley was "not the one that hatched the idea," the district court concluded that O'Malley was a relatively less culpable participant in the conspiracy and credited that finding by using it as a ground for departing downward.

Sentencing Transcript at 23. Upon review, we cannot say that O'Malley may not receive a downward *adjustment* under USSG § 3B1.2 for his mitigating role; however, there is nothing so unusual in the circumstances of the present case to warrant a downward *departure* on that basis.

Finally, as to the district court's third reason for the downward departure – the adverse economic impact O'Malley's incarceration would have on the community – we note that this factor is expressly discouraged as a ground for departure under the guidelines. See USSG 5H1.6 ("Family ties and responsibilities and community ties are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range."). Consequently, a downward departure on this basis is permitted only if O'Malley's community ties are truly exceptional. We have carefully reviewed the character letters submitted by O'Malley, as well as the district court's explanation for its decision, and we conclude that the circumstances in the present case are not so exceptional. As we have previously explained, "[a]lthough downward departure on this ground is not ruled out as a matter of law, the mere fact a business faces likely failure and innocent others will be disadvantaged when its key person goes to jail is not by itself unusual enough to warrant a departure." United States v. Morken, 133 F.3d 628, 630 (8th Cir. 1998) (internal citations, quotation marks, and ellipsis omitted). In sum, the downward departure was not justified by O'Malley's community ties, and the district court erred in sentencing O'Malley outside the applicable guideline range.

## Conclusion

O'Malley's sentence is vacated. The case is remanded to the district court for further sentencing proceedings consistent with this opinion.

_____