REVISED March 17, 2010
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 07-60732

**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

March 12, 2010

Charles R. Fulbruge III
Clerk

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

JAMES FORD SEALE

Defendant - Appellant

Appeal from the United States District Court for the
Southern District of Mississippi

Before DAVIS, SMITH and DeMOSS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

In this appeal, we consider several issues raised by James Ford Seale who was found guilty of two counts of kidnaping and one count of conspiracy to commit kidnaping, in violation of 18 U.S.C. §§ 1201(a), (c). For the following reasons, we AFFIRM Seale's conviction.

I.

A.

Seale was charged both with conspiring with unnamed members of the White Knights of the Ku Klux Klan ("KKK") to kidnap Henry Dee and Charles Moore and the kidnaping of Dee and Moore.

In 1964, Seale was a member of the Bunkley klavern, a local chapter of the KKK in Franklin County, Mississippi. Members of the Franklin County population feared that black militants or members of the Black Panther group were stockpiling guns to lead an insurrection. Dee, an African-American, was suspected of involvement in this activity.

On the morning of May 2, 1964, Charles Edwards, Clyde Seale,[1] Archie Prather, and Curtis Dunn, all members of the KKK, met with Seale outside the Bank of Franklin in Meadville, Mississippi to positively identify Dee. When Dee left the bank, he met with his friend Moore, also an African American. Dee and Moore began hitchhiking; Seale picked them up and drove to Homochitto National Forest (the "Forest"). Edwards, Clyde, Prather, and Dunn followed them.

Upon arrival in the Forest, Edwards, Dunn, and Clyde beat Dee and Moore with tree branches in an effort to determine where the guns were stored. Dee and Moore told them the guns were in the First Baptist Church in Roxie, Mississippi (the "Church"). Edwards, apparently understanding that Dee and Moore would be killed, asked Dee if he was "right with the Lord." Edwards, Clyde, and Prather then departed to get a warrant to search the Church, and Seale and Dunn stayed with Dee and Moore in the Forest. The last time Edwards saw Dee and Moore they were alive and getting in the back of Seale's car. The Church was searched and no guns were found. After the search, Clyde and Prather took Edwards to his house. Clyde told Edwards to "keep [his] mouth shut" and that "everything would be [taken] care of," a statement Edwards understood to mean that Dee and Moore would be killed.

Seale later told Edwards what transpired after Edwards had left the Forest. Jack Seale ("Jack") and Ernest Parker met Seale at an unknown

---

[1] Seale's father and head of the Bunkley klavern.

2

location. Dee and Moore were wrapped with duct tape and placed in the trunk of Parker's car. Dee and Moore were alive at this time. Seale, his father, and Parker then drove to an area on the Old Mississippi River known as Parker's Island, owned by Parker and his brother. Dee and Moore were taken from Mississippi to Louisiana via Highway 84, which connected to Highway 65, to reach Parker's Island. Specifically, to get to the island by car, the group had to cross the Old Mississippi River at Natchez and drive through part of Louisiana.[2] Seale, Jack, and Parker then separately weighed down Dee and Moore with an engine block and scraps of metal, took them from Parker's Landing onto the Old Mississippi River in a small boat, and rolled them into the water to drown.

Two groups of human remains were recovered in July 1964, and another group of remains was recovered in October 1964. At trial, John Rogan, one of the people who recovered the remains, testified that one group was found up-river from Parker's Landing while the other group was found down-river from Parker's Landing. John Barnes, an engineer with the Army Corps of Engineers, testified that it was possible to launch a boat from an industrial complex in Vicksburg, Mississippi, and continue on the Old Mississippi River to the point where the bodies were found without leaving the state of Mississippi. Seale argues that this intrastate route was taken as opposed to the interstate route argued and accepted by the jury at trial.

On January 24, 2007, Seale was indicted. He was charged with one count of conspiracy to commit kidnaping in violation of 18 U.S.C. § 1201(c) and two counts of kidnaping in violation of 18 U.S.C. § 1201(a). The defendant filed numerous pretrial motions, including a motion to dismiss based on the statute of limitations, a motion to dismiss based on pre-indictment delay, a motion to suppress the defendant's 1964 statement to the FBI, and a motion in limine to

---

[2] The area north of the Old Mississippi River is in Louisiana, while the area to the south is in Mississippi. Dee and Moore were found on the Mississippi side of the river.

exclude evidence of Seale's motive. After lengthy hearings, the district court denied these motions. At the close of the Government's case, Seale moved for judgment of acquittal, renewing his previous motions for dismissal. The court denied this motion. At the close of all the evidence, Seale renewed his motion for judgment of acquittal, which the district court also denied. The jury returned a verdict of guilty on all counts in the indictment. The district court sentenced Seale to life imprisonment on each of the three counts. Seale timely appealed.

## B.

On appeal, Seale argued, among other issues, that his prosecution was time-barred by 18 U.S.C. § 3282. A panel of this court agreed, reversed the district court judgment, and rendered a judgment of acquittal. See United States v. Seale, 542 F.3d 1033 (5th Cir. 2008). The Government filed a petition for rehearing en banc which was granted by this court and had the effect of vacating the panel opinion. See United States ex. rel. Marcy v. Rowan Cos., 520 F.3d 384, 389 (5th Cir. 2008) (explaining that when this court grants a rehearing en banc, the panel opinion is vacated). Following argument, the en banc court was equally divided and the court nominally affirmed the district court's denial of the motion to dismiss. United States v. Seale, 570 F.3d 650 (5th Cir. 2009). The appeal was returned to the original panel for consideration of the remaining issues raised by Seale.

Following the en banc court's decision, Seale filed a Motion to Certify Question of Law to the Supreme Court of the United States. The en banc court by majority vote granted the motion and certified the question to the Supreme Court. United States v. Seale, 577 F.3d 566 (5th Cir. 2009). However, the Supreme Court dismissed the certified question, with Justices Scalia and Stevens dissenting. United States v. Seale, 130 S.Ct. 12 (2009).

Accordingly, this panel now addresses the remaining issues raised by Seale in this appeal.

## II.

Seale contends first that the district court erred by denying his motion to dismiss based on the Government's delay in seeking an indictment.

During the months following the May 2, 1964 disappearances of Dee and Moore, federal law enforcement agents investigated the incident. Federal agents interviewed witnesses and potential suspects, obtained warrants to search for physical evidence, and sent divers to search for remains in the river. On November 6, 1964, Mississippi authorities arrested Seale and Edwards for the murders of Dee and Moore; however, on January 11, 1965, at the request of the Franklin County District Attorney, the charges were dismissed without prejudice. The United States obtained an indictment against Seale on January 24, 2007.

Seale argued to the district court that the Government's delay in bringing the indictment was in bad faith. After a hearing on the motion, the district court concluded that Seale's argument was not supported by the facts. Specifically, the district court found that the Government's delay was caused by its inability to establish federal jurisdiction for the kidnaping of Dee and Moore. In dismissing the motion, the district court ruled, "Once the Government determined that this court, a federal court, could have jurisdiction based upon newly discovered matters, then the Federal Government moved this litigation forward." The district court also found that Seale failed to prove that the delay caused him actual and substantial prejudice.

In reviewing a claim of due process violation on pre-indictment delay, the district court's factual determinations are reviewed for clear error; its conclusions of law, de novo. United States v. Avants, 367 F.3d 433, 441 (5th Cir. 2004).

Although more than forty years elapsed from the date of the alleged crime to Seale's indictment, this fact alone does not establish a due process violation. The mere passage of time is insufficient to support a due process claim, even if the time lapse prejudiced the defense. Dickerson v. Guste, 932 F.2d 1142, 1144 (5th Cir. 1991). To show an unconstitutional pre-indictment delay, a party must establish two elements: 1) the Government intended to delay obtaining an indictment for the purpose of gaining some tactical advantage over the accused in the contemplated prosecution or for some other bad faith purpose, and 2) that the improper delay caused actual, substantial prejudice to his defense. United States v. Crouch, 84 F.3d 1497, 1523 (5th Cir. 1996) (en banc). The burden is on the defendant to establish both prongs. United States v. Jimenez, 256 F.3d 330, 345 (5th Cir. 2001).

With respect to the first prong, Seale points to a Memorandum written by federal agents in the period shortly after Seale's arrest which concluded that "it would be more advantageous to present the matter to a Grand Jury at a later date." This, Seale maintains, is evidence that the Government's decision not to indict Seale for more than forty years was in bad faith. The Government, however, contends that Seale's reading of the Memorandum is incorrect; specifically, the Government argues that the reason behind its delay–to gain more information about the crimes–was justifiable. The district court accepted the Government's interpretation of the memos.

In United States v. Lovasco, 431 U.S. 783 (1977), the Supreme Court distinguished between investigative delay and tactical or bad faith delay. In distinguishing between the two, the Court stated:

> Investigative delay is fundamentally unlike delay undertaken by the Government solely "to gain tactical advantage over the accused" precisely because investigative delay is not so one-sided. Rather than deviating from elementary standards of "fair play and decency," a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute

and will be able promptly to establish guilt beyond a reasonable doubt.

Id. at 795 (internal citations and quotations omitted). Applying the Court's analysis in Lovasco to this case, we are satisfied that the district court did not err in concluding that the delay preceding Seale's indictment was investigative rather than tactical. In a Memorandum dated June of 1965, the Assistant Attorney General of the Civil Rights Division expressed concern to the Director of the F.B.I. that in order for Seale to be indicted under 18 U.S.C. § 1201, the Government would be required to show that Seale had actual or constructive knowledge that the victims were transported across state lines. The Assistant Attorney General wrote, "In light of [this element], and as part of your continuing investigation, please seek to establish this knowledge on the part of [Seale]." Central to the FBI's difficulty in acquiring evidence to indict Seale under § 1201 was the silence of the suspects and the unwillingness of any witnesses to come forward and testify. Accordingly, the district court did not err in concluding that it was only after the Government obtained Edwards' cooperation that the United States had enough evidence to justify proceeding with a federal indictment against Seale.[3] Therefore, the district court did not err in rejecting Seale's contention that the Government delayed its case in bad faith to gain a tactical advantage. To the contrary, the evidence supports the district

---

[3] At trial, Edwards testified that Seale told him about the details of the route the co-conspirators took once they had kidnaped Dee and Moore.

Q:    James Seale told you that they went out to Parker's land?
A:    The island, Parker's Island, yes, ma'am.
Q:    Did he tell you how they got there?
A:    They went across the river at Natchez, went up 84 and took 65 up there.
Q:    Is it your understanding that that was going through part of the state of Louisiana?
A:    Yes, ma'am.

court's interpretation of the Department Of Justice memoranda that the Government delayed because it lacked necessary evidence to proceed with a prosecution.

Since the defendant bears the burden to show both the Government's bad faith and prejudice to the defendant in order to establish a due process violation based on undue delay, it is not necessary to inquire whether the prosecution's delay caused actual, substantial prejudice to Seale's defense.

## III.

### A.

Seale argues next that the district court erred in refusing to suppress the oral statement that Seale gave to FBI agents after his arrest.

When Seale was arrested on November 6, 1964, he was transported from his home in Franklin County to police headquarters in Jackson, Mississippi. Although he was arrested by two Mississippi Highway State Police (MHSP) officers, two FBI agents also accompanied Seale to Jackson. While en route, the MHSP officers asked Seale questions about the murders of Dee and Moore. Seale was silent. About thirty minutes into the trip, an FBI agent said to Seale:

> We know that on Saturday afternoon May 2, 1964, you picked up in your car Henry Dee and Charles Moore, two Negro boys from Roxie. You and Charles Edwards and others took them to some remote place and beat them to death. You then transported and disposed of their bodies by dropping them in the Mississippi River. You didn't even give them a decent burial. We know you did it, you know you did it, the Lord above knows you did it.

Seale responded by saying, "Yes, but I'm not going to admit it, you are going to have to prove it," and adding, "I'm not going to say anything more."

Seale filed a motion to suppress the statement made to the FBI agent, arguing that it was involuntarily given and thus illegally obtained. Seale contended that since his arrest took place before the Supreme Court's decision

in Miranda v. Arizona, the pre-Miranda standard of voluntariness applied.[4] The Government and the district court also assumed that the pre-Miranda standard applied.

Applying the pre-Miranda standard advocated by Seale and the Government, the district court denied Seale's motion to suppress. In his initial appellate brief to this court, Seale argued that the district court erred in denying his motion to suppress his statement under the pre-Miranda standard of voluntariness: "The alleged confession occurred before the Supreme Court decided Miranda. This Court must therefore rely on pre-Miranda case law to determine the applicable test for a claim of involuntary confession. The test is set forth in Haynes v. Washington." In its appellate brief, however, the Government recognized that Seale, the Government, and the district judge had all been in error with respect to the standard that controlled the admissibility of Seale's statement because the Supreme Court had clearly stated in Johnson v. New Jersey, "Miranda applies only to cases in which the trial began after the date of our decision." 384 U.S. 719, 721 (1966) (emphasis added). See also Bell v. Alabama, 367 F.2d 243, 247 (5th Cir. 1966). In his reply brief, Seale acknowledged his previous error and sought for the first time to have his statement suppressed under the Miranda standard.

B.

---

[4] In his Memorandum of Authorities to the district court in support of his motion to suppress, Seale stated, "In order to determine whether a confession or admission is voluntary, the Court looks at the totality of circumstances and should include circumstances such as the level of the defendant's education or intelligence, the absence of advice to the defendant about his constitutional rights, the use of physical force and/or the use of psychological coercion." Before ruling on the motion, the trial judge laid out the arguments he had considered stating, "The defendant acknowledges that the facts and circumstances preceded the United States Supreme Court decision in Miranda."

In his reply brief, Seale argues that despite the erroneous and misleading argument he presented both to the district court and to this court, he properly preserved for appeal his argument that the Miranda standard applies. We now address that argument and examine first the contrast between the Haynes (pre-Miranda) standard and the Miranda standard for deciding the admissibility of a confession.

1.

Before Miranda was decided, a voluntariness test, which depended upon the totality of circumstances surrounding the accused's statement, was used to determine whether the due process clause of the Constitution required exclusion of a confession. LAFAVE AND ISRAEL, CRIMINAL PROCEDURE 341 (2009). To make this voluntariness determination, courts were invited to inquire into a number of circumstances such as the education of the defendant, the duration of the interrogation, whether the statement was made in an atmosphere of substantial coercion and inducement, whether the defendant was alone in the hands of the police, whether the defendant had a reason to believe that the police had the power to carry out their threats, and other inquiries relevant to voluntariness. See generally Fikes v. Alabama, 352 U.S. 191 (1957); Leyra v. Denno, 347 U.S. 556 (1954), Lynumn v. Illinois, 372 U.S. 528 (1963); Haynes v. Washington, 373 U.S. 503 (1963)  As the Court in Haynes v. Washington stated, "The true test of admissibility is that the confession is made freely, voluntarily, and without compulsion or inducement of any sort.  And of course, whether the confession was obtained by coercion or improper inducement can be determined only by an examination of all the attendant circumstances." 373 U.S. at 513.  The objective of this inquiry was to determine whether the accused's due process rights had been violated.

The Court in Miranda, however, concluded that the totality of circumstances analysis was no longer the inquiry to determine the admissibility

of a statement given when a person was in custody. Rather than looking at the many circumstances surrounding the statement, the Court announced that admissibility would be based on whether specific warnings were given by law enforcement to the offender:

> Accordingly we hold that an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation under the system for protecting the privilege we delineate today. As with the warnings of the right to remain silent and that anything stated can be used in evidence against him, this warning is an absolute prerequisite to interrogation. No amount of circumstantial evidence that the person may have been aware of this right will suffice to stand in its stead. Only through such a warning is there ascertainable assurance that the accused was aware of this right.

Miranda v. Arizona, 384 U.S. 436, 471–72 (1966).[5] See also Johnson v. New Jersey, 384 U.S. 719, 729–30 (1966). With this rule, the Court shifted its focus of admissibility from the due process clause of the Fourteenth Amendment to the Fifth and Sixth Amendment rights of the accused, including the right to counsel and the right against self incrimination.

Despite Miranda's clear repudiation of the totality of the circumstances test that Seale argued should apply to his confession, Seale now contends that he preserved his Miranda argument for appeal. The dissent also argues that Seale preserved his argument, because "Miranda did not overrule or supplant the voluntariness test." Insofar as it is relevant in this case, we disagree.[6] No

---

[5] See also LAFAVE AND ISRAEL, CRIMINAL PROCEDURE 367-68 (2009) ("Miranda thus represents a striking contrast to . . . the Court's usual 'totality of circumstances' approach to the due process voluntariness issue.").

[6] We agree that voluntariness issues may have relevance post-Miranda. Stephen J. Schulhofer, Confessions and the Court, 79 MICH. L. REV. 865, 873 (1981). For example, after giving a Miranda warning, the government could not torture a defendant and coerce a confession and then argue that it is admissible because the warnings were given. See Berkemer v, McCarty, 468 U.S. 420, 433 n.20 (1984) ("We do not suggest that compliance with Miranda conclusively establishes the voluntariness of a subsequent confession. But cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled'

case demonstrates the contrast between the two standards more clearly than Dickerson v. United States, 530 U.S. 428 (2000).

In Dickerson, the Court considered the constitutionality of a federal statute 18 U.S.C. § 3501 pertaining to the admissibility of confessions. Id. The statute was passed by Congress two years after Miranda was decided and set forth a series of factors the trial judge should follow in determining the voluntariness of a defendant's statement. Id. at 435–36.[7] The Dickerson court recognized that § 3501(b) essentially codified the pre-Miranda totality of circumstances test for admissibility. Id. at 442–43. The threshold question before the Court was whether the statute's totality of circumstances test conflicted with the admissibility standard the Supreme Court adopted in

_____

despite the fact that the law enforcement adhered to the dictates of Miranda are rare.")

In the briefs to this court, Seale makes no argument that the admissibility of his statement should not be governed by Miranda. See Miranda, 384 U.S. at 461. Accordingly the totality of the circumstances test is not applicable to this case.

[7] 18 U.S.C. § 3501 reads, in pertinent part:

> (b) The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

> The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession.

Miranda. Id. at 437. The Dickerson court concluded that the two rules were in conflict and that § 3501(b) reflected Congress' intent to overrule Miranda. The Court stated:

> In Miranda, the Court noted that reliance on the traditional totality-of-the-circumstances test raised a risk of overlooking an involuntary custodial confession, a risk that the Court found unacceptably great when the confession is offered in the case in chief to prove guilt. The Court therefore concluded that something more than the totality test was necessary . . .§ 3501 reinstates the totality test as sufficient. Section 3501 therefore cannot be sustained if Miranda is to remain the law.

Id at 442 (internal citation omitted).

The Court observed that Miranda shifted the focus of the question of admissibility from determining whether a defendant's will was overwhelmed to protecting a defendant from the dangers of deceptive police interrogation tactics and the risk that his Fifth Amendment right against self incrimination and Sixth Amendment right to counsel would be violated:

> [Miranda] concluded that the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be accorded his privilege under the Fifth Amendment not to be compelled to incriminate himself. Accordingly, we laid down concrete constitutional guidelines for law enforcement agencies and courts to follow. Those guidelines established that the admissibility in evidence of any statement given during custodial interrogation of a suspect would depend on whether the police provided the suspect with four warnings.

Id. at 435 (internal citations and quotation marks omitted).

Perhaps more important than the purely legal differences between the pre-Miranda and Miranda standard of admissibility, the rule announced in Miranda effected a sea change in the day to day trials of motions to suppress confessions.

As stated above, for custodial interrogations before Miranda, the parties and the court were required to consider multiple factors to determine the admissibility of the statement; after Miranda, the judge's inquiry was straightforward: did the defendant receive the warnings before making the statement. If the answer to this question is no, an irrebuttable presumption arises that the statement made without benefit of the warning was illegally obtained and must be suppressed. See Oregon v. Elstad, 470 U.S. 298, 307 (1985). Seale's case provides an excellent example of the practical difference in administering both standards. In his motion to suppress, Seale argued that the court should weigh a host of factors–none of them dispositive in determining the admissibility of Seale's statement: was Seale given a warning when the officers picked him up?; how long was the questioning in the car?; did the officers elbow Seale when he gave them an answer?; did the officers appeal to Seale's moral conscience to ensure that the victims had received a Christian burial? Upon recognizing in his reply brief on appeal that Miranda applies to the statement, Seale spends little more than a page of his brief arguing the straightforward Miranda standard: was Seale given the required warning.

For all of the these reasons, it is clear to us that the rule announced in Miranda, with its roots in the Fifth and Sixth Amendments, and the totality of circumstances test, with its roots in the Due Process Clause of the Fourteenth Amendment, are vastly different and, as Dickerson makes clear, in conflict with each other. We now turn to Seale's objection to the confession's admissibility and whether it was adequate to preserve the argument he makes to us that the district court erred in admitting the statement because Miranda warnings were not given.

2.

Seale's statement about the kidnaping of Dee and Moore occurred in 1964 before Miranda was decided in 1966, and Seale was not indicted and tried until

2007. According to the Supreme Court's decision in Johnson v. New Jersey, the standard announced in Miranda applies to this case. Johnson v. New Jersey, 384 U.S. at 719. As discussed in § III - A, in every presentation of his suppression motion to the district court and to this court–save for his reply brief to this court–Seale's counsel made it clear that he was objecting to the voluntariness of Seale's statement under the pre-Miranda standard as articulated in Haynes.

Thus Seale has two potential problems in establishing that he properly preserved his argument that the Miranda standard applies and his statement should have been suppressed for that reason: (1) rather than directing the district court to the straightforward Miranda standard, which asks whether a proper warning was given to him, Seale affirmatively asked the judge to consider the multi-factor test announced in Haynes in determining whether the statement was voluntary and properly admissible; (2) Seale affirmatively argued to this court on appeal that the Haynes standard–rather than the Miranda standard–applied; his argument to us on that issue was that the district court erred in applying the Haynes standard, not that the judge applied the wrong standard.

FED. R. EVID. 103(a)(1) sets out the manner in which objections must be made to preserve error for appeal:

> (a) Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected and
>> (1) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record stating the specific ground of objection, if the specific ground was not apparent from the context.

This rule serves to ensure that "the nature of the error [is] called to the attention of the judge, so as to alert him to the proper course of action and enable opposing counsel to take corrective measures." Advisory Committee's Note to Rule 103(a)

(1972). See also 1 S. BROWN, MCCORMICK ON EVIDENCE 253 (6th ed. 2006) ("If the administration of the exclusionary rules of evidence is to be fair and workable the judge must be informed promptly of contentions that evidence should be rejected, and the reasons therefor. The burden is placed on the party opponent, not the judge.").

We have not located cases with facts as egregious as this case: where an appellant affirmatively misleads the court regarding the legal standard that controls the objection. Until Seale filed his reply brief in this court, Seale never strayed from his erroneous argument that the pre-Miranda standard of general voluntariness applied. The dissent recognizes that Seale never argued that Miranda applied to this case but nevertheless maintains that Seale's argument that he had not been advised of his right to remain silent sufficiently preserved the argument he now makes that his statement should have been suppressed because the Miranda warnings were not given. But Seale's reference in his motion and memorandum to the failure to give a warning was in the context of his discussion of the Haynes factors. He never put the district court on notice that the admissibility of his statement should be analyzed under Miranda.

FED. R. EVID. 103(a)(1) and the cases interpreting that rule establish that when the objection is not specific as to the legal basis for the objection, the error is not preserved and can only be reviewed for plain error.

In United States v. Mejia, 844 F.2d 209 (5th Cir. 1983), we addressed an issue on appeal under plain error review because counsel's timely objection lacked the specificity required by FED. R. EVID. 103(a)(1). In Mejia, the prosecution produced evidence tending to show that defendant Mejia's acts indicated a guilty conscience. Id. at 214. To rebut this evidence, Mejia attempted to elicit testimony from a witness who would testify about a conversation he had with Mejia to show that Mejia had an innocent state of mind. Id. The prosecution, however, objected to the testimony, arguing that it was hearsay.

Id. The prosecution's objection was sustained and the testimony was excluded. Id. On appeal, Mejia argued that the testimony he sought to offer should have been admitted at trial since it fell into the hearsay exception of Fed. R. Evid. 803(3), then existing mental, emotional, or physical condition. Id. This court rejected Mejia's argument and stated:

> Whatever the merit of Mejia's argument, his trial attorney failed to preserve this issue for appeal because he did not argue this hearsay exception to the trial court. We have long held that, absent a showing of manifest injustice, a litigant may not raise a theory on appeal that was not presented to the district court.

Id. at 214–15 (internal citations and quotations omitted).

Our sister circuits require a similar degree of specificity to preserve an argument for appeal. In United States v. Sims, 617 F.2d 1371 (9th Cir. 1980), the defendant offered into evidence a statement contained within an FBI report. The prosecution objected that the report was hearsay while the defense maintained that the report came in under the business records exception. Id. at 1376. The trial judge ruled that the report was not admissible. Id. On appeal, the defendant argued, for the first time, that the statement in the report was not hearsay because it was not offered to prove the truth of the statement. Id. The defendant also reurged his business records exception argument made before the district court. Id. The Ninth Circuit addressed the business records exception objection under an abuse of discretion standard but reviewed the argument that the statement itself was not hearsay for plain error, stating:

> Since the other grounds were not raised in the district court, this court must employ a much more limited scope of review in considering them. A party must make known to the court at the time the ruling or order is made or sought . . . the action which he desires the court to take or his objection to the action of the court and the grounds therefor. The presentation of additional evidentiary theories on appeal is inconsistent with the salutary purpose of the timeliness requirement to allow the trial judge to

17

make an informed ruling based on the issues as framed by the parties before the evidence is excluded.

Id. at 1377 (citations and internal quotations omitted).

Because the primary purpose of FED. R. EVID. 103(a)(1) is to assist the judge in avoiding error and correctly ruling on evidentiary objections, the corollary is that to preserve the objection, the "specific ground" for the stated objection must be the correct one. United States v. O'Brien, 435 F.3d 36, 39 (1st Cir. 2006) (citing United States v. Diaz, 300 F.3d 66, 75-76 (1st Cir. 2002)). In O'Brien, during cross-examination of the defendant, the prosecution made a reference to the defendant's silence after the defendant had received his Miranda warning. Id. at 38. In response, counsel for the defendant objected, arguing that the prosecution's statement should be stricken since "[Defendant] was not under any general obligation to speak to the FBI." Id. at 39. The prosecutor's statement clearly violated the Supreme Court's holding in Doyle v. Ohio, 426 U.S. 610 (1976), where the Court held that all references to a defendant's silence after receiving his Miranda warnings were unconstitutional. Id. The First Circuit found that the ground counsel for the defendant argued was wrong since counsel did not reference Doyle. Id. The Court further stated:

> This is not necessarily a criticism of defense counsel. No lawyer carries around in his or her head all of the endless precedents on evidence and procedure, and while it would be strange for a defense counsel not to know the Miranda rule, many lawyers have never heard of Doyle. And neither have many judges: that is why objecting counsel either had to point to Doyle or a counterpart case or had to articulate an objection that was in substance close to the rationale of Doyle
>
> The law is nothing if not practical. Where objecting counsel offers the right objection, the judge has to get the ruling right and will otherwise be reversed unless the error is patently harmless. If the wrong objection or none at all is offered, the conviction will ordinarily be reversed if (1) an error occurred in admitting evidence;

18

(2) the error was plain; (3) it likely altered the result; and (4) it reflects some fundamental unfairness.

Id. Accordingly, the First Circuit held, plain error review was appropriate.

In his reply brief to this court, Seale argues that despite his misleading argument to the district court, his objection to the admission of his alleged confession was "ample and timely to bring the alleged . . . error to the attention of the trial court and enable it to take appropriate corrective action." In support of this contention, Seale cites three cases, all distinguishable from this case.

In United States v. Williams, 985 F.2d 749 (5th Cir. 1993), defendants were charged with aiding and abetting the use of a firearm in relation to a drug offense. On appeal, the defendants contended that the court failed to instruct the jury properly on the requisite intent for this offense. Id. at 754. In determining the proper standard of review, this court looked to the substance and specificity of counsel's objection to the jury instruction. Id. at 755. In his initial objection, counsel objected that the charge failed to require the jury to find the defendants had knowledge of the presence of the weapon. Id. In response, the trial court agreed to amend the charge, stating that the new charge "will satisfy "knowledge." Id. After the court amended the charge, however, it did not adequately cure the defect to require a finding of knowledge. Id. Nevertheless, after the court amended the instruction, counsel did not make a further objection to the amended charge. Id.

Despite counsel's failure to make an additional objection we concluded that counsel's first objection "was adequate to alert the court of her position that the defendant's knowledge of the presence of the weapon was an essential element of the offense." Id. For this reason, we held that the argument was preserved in accordance with FED. R. EVID. 103(a)(1). Id. Unlike Williams, Seale never made the proper objection so as to alert the trial court that the Miranda standard applied and to determine, under the proper standard,

whether Seale's statement was admissible. Indeed, Seale's affirmative misrepresentation of the correct standard did more than fail to alert the court to the proper standard, it affirmatively led the court into error.

Furthermore, Seale's reliance on Osborne v. Ohio, 495 U.S. 103 (1990) and Douglas v. Alabama, 380 U.S. 415 (1990) is misplaced. In both of these cases, counsel's objections were sufficiently specific to afford the trial court the opportunity to take appropriate action.[8]

In short, Seale points to no case holding that a party who affirmatively asked the trial court to apply an incorrect legal standard nevertheless preserved his argument for appeal that the lower court erred in failing to apply the correct

---

[8] In Douglas v. Alabama, counsel for the defendant objected three times to prosecution's reading of a confession to the jury, each one sufficient to give the trial judge the ability to take corrective action. 380 U.S. 415 (1990). The error that counsel brought to the attention of the trial court was the confession's infringement on the defendant's Sixth Amendment right to confront his accuser; in this regard, his objection was sufficient to give the trial court the ability to cure the error. Id. at 421. At trial, counsel stated "I'd first like to object to the reading of this purported confession on the grounds that it is hearsay evidence, that it was made outside the hearing of this defendant, it was not subject to cross-examination, and we move to exclude it from evidence. Id. at 421 n.4. Therefore, the Supreme Court stated, "On these facts, it is clear that the defense brought the objection to the attention of the court at several points, at any of which corrective action could have been taken by stopping the questioning, excusing the jury, or excluding the evidence." Id. at 423.

In Osborne v. Ohio, the defendant was charged with possessing child pornography. 495 U.S. 103 (1990). Under the statute, the State had to prove knowledge and that the defendant "possessed material depicting a lewd exhibition or graphic focus on genitals." Id. at 123. At the onset of trial, counsel for defendant argued that the statute–specifically, the language "lewd exhibition"–was unconstitutionally overbroad. Id. at 124. The trial judge overruled the motion. Id. When presented with an opportunity to object to jury instruction, defendant failed to renew his objection. Id. The Supreme Court, relying on its decision in Douglas, held that defendant's attorney pressed the issue of the State's failure of proof on lewdness before the trial court and,

> [U]nder the circumstances, nothing would be gained by requiring Osborne's lawyer to object a second time, specifically to the jury instructions. The trial judge, in no uncertain terms, rejected counsel's argument that the statute as written was overbroad.

Id.

standard. We therefore review the failure of the trial court to suppress Seale's statement under a plain error standard.

Moreover, we have an independent ground to review Seale's argument for plain error. It is uncontested that Seale argued to this court for the first time in his reply brief that the Miranda standard applied. Ordinarily, we do not consider any argument made for the first time in a reply brief. Dufrene v. Browning-Ferris, Inc., 207 F.3d 264, 268 (5th Cir. 2000). However, if we do address such an argument, we review it at most for plain error. Id. See also United States v. Gonzales, 661 F.2d 488, 493 (5th Cir. 1981) (where appellee's brief first raises issue and appellant responds to appellee' in his reply brief, we review for plain error).

C.

Seale argues that even under the plain error standard of review, the district court committed reversible error in admitting Seale's statement. Federal Rule of Criminal Procedure Rule 52(b) provides "a plain error that affects substantial rights may be considered even though it was not brought to the court's attention." To grant relief under this rule, the appellate court must determine (1) that there was an error, that is, a deviation from a legal rule, (2) that the error is "plain," meaning obvious, and (3) that the error affected substantial rights, meaning that it must be prejudicial and affect the outcome of the district court proceeding. See United States v. Olano, 507 U.S. 725, 731–35 (1993). Finally, because granting relief under plain error review is discretionary rather than mandatory, the court of appeals should correct a plain error affecting substantial rights only if the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Id. at 736 (internal quotation marks omitted); accord United States v. Mansolo, 129 F.3d 749, 751

(5th Cir. 1997). The Supreme Court has also held that Rule 52(b) applies regardless of the seriousness of the error, including constitutional error.[9]

It is uncontested that the first two requirements set out in Olano are satisfied. First, there was error. In Johnson v. New Jersey, 384 U.S. at 734 , the Supreme Court announced that the Miranda rule applies to all trials that begin after the Court's 1966 decision in Miranda. Since Seale was tried in 2007, the standard set-forth in Miranda should have been applied when determining whether Seale's statement to the FBI investigator should have been suppressed. Because the FBI agent gave no warning to Seale as Miranda requires, the statement should have been excluded under that standard. Thus, the district court was in error. Seale also established that the error was obvious. See Olano, 507 U.S. at 734. The Supreme Court's holding in Johnson that Miranda applied to all trials conducted after 1966 had been established over forty years when the trial occurred.

But even though the error was obvious, it must also affect substantial rights, meaning that it must be prejudicial and affect the verdict. See id. at 734–35. Resolving the effect of Seale's statement on the jury's verdict is not an easy task. On the one hand, the statement is far from an unequivocal admission of

---

[9] See, e.g., Johnson v. United States, 520 U.S. 461, 466 (1997) ("Petitioner argues that she need not fall within the 'limited' and 'circumscribed' strictures of Olano, because the error she complains of here is 'structural,' and so is outside Rule 52(b) altogether. But the seriousness of the error claimed does not remove consideration of it from the ambit of the Federal Rules of Criminal Procedure."); United States v. Cotton, 535 U.S. 625, 634 (2002) ("[Defendants] emphasize that the Fifth Amendment grand jury right serves a vital function in providing for a body of citizens that acts as a check on prosecutorial power. No doubt that is true. But that is surely no less true of the Sixth Amendment right to a petit jury, which, unlike the grand jury, must find guilt beyond a reasonable doubt. The important role of the petit jury did not, however, prevent us in Johnson from applying the longstanding rule 'that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right.'") (citation omitted).

guilt. Seale's counsel repeatedly emphasized this fact and characterized the statement as nothing more than a challenge to law enforcement and an indication of Seale's unwillingness to aid the FBI in their investigation. On the other hand, in its rebuttal argument to the jury, the prosecutor characterized the statement as "words of a defiant, arrogant, guilty man, confident that he would never face prosecution."

Nevertheless, the evidence was clearly sufficient to support the conviction without the statement. Edwards, whose testimony the jury apparently accepted, gave the jury all of the gory details of the horrible crime. Edwards' testimony was not totally uncorroborated. His testimony was corroborated by physical evidence of the location of the victims' remains in the Mississippi River and the manner in which they were weighed down to prevent their discovery. At trial, Edwards testified how he and other co-conspirators left Seale and the victims to seek out the Franklin County Sheriff to search the Roxie Baptist Church for guns. According to Edwards, no guns were found. Although no law enforcement record of the search was produced at trial, the personal diary of Reverend Briggs, Pastor of the Roxie Baptist church, was admitted. In a diary entry dated Saturday, May 2, 1964, Briggs wrote that law enforcement and the KKK came to search the Roxie Baptist church for guns. Briggs' account of the event was independently corroborated by his daughter. This testimony also supports Edwards' testimony of the details of the kidnaping. The Government also produced evidence of Seale's membership in the KKK, as well as his violent and racially inflammatory statements, all of which were probative of Seale's motive and intent.

We conclude that we need not resolve whether the admission of Seale's statement affected his substantial rights. Assuming without deciding that the statement had such an effect, we decline to exercise our discretion under Oleano's fourth prong to grant Seale relief on this claim.

23

In Johnson v. United States, 520 U.S. 461, 470 (1997), the defendant who was convicted for perjury, argued on appeal that the trial court's failure to instruct the jury on materiality was plain error. The Supreme Court recognized that the error was obvious. Id. at 467–68. It found it unnecessary, however, to resolve whether that error affected the defendant's substantial rights. Id. at 469. The Court reasoned that:

> On this record there is no basis for concluding that the error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings. Indeed, it would be the reversal of a conviction such as this which would have that effect. Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it. No miscarriage of justice will result here if we do not notice the error.

Id. at 470 (citations and internal quotations omitted). Similarly, we conclude that the trial court's error in admitting Seale's statement did not result in a manifest miscarriage of justice. For reasons discussed above, we are satisfied that the Government presented a strong case of guilt. While the defendant's statement may have been helpful to the Government, it was certainly not the centerpiece of its case.

We also decline to exercise our discretion to give relief to Seale because of the defendant's responsibility for the court's error. Although in this case both the defendant and the Government were in error in arguing the incorrect standard for the admissibility of Seale's statement, Seale's counsel had the primary responsibility of marshaling the facts and law to persuade the court to exclude Seale's statement.

In sum, because we conclude that no miscarriage of justice will result here if we do not notice this plain error, we decline to do so and find that the admission of Seale's statement was not reversible error.

IV

Seale argues next that the district court erred in admitting the opinion of the Government expert regarding the cause of the victims' deaths. Dr. Steven T. Hayne, a forensic pathologist, gave expert testimony that the deaths of Moore and Dee were caused by fresh-water drowning. On appeal, Seale contends that the district court abused its discretion in admitting this testimony over Seale's objection.

The admission or exclusion of expert testimony is reviewed under an abuse of discretion standard. Moore v. Ashland Chem., Inc., 151 F.3d 269, 274 (5th Cir. 1998) (en banc).

Seale does not challenge Dr. Hayne's qualifications to give an opinion on the cause of the victims' deaths. Rather Seale argues that Hayne's testimony should have been excluded under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), because Hayne did not base his opinions on scientific evidence but instead relied solely on the testimony of Charles Edwards. This argument is unavailing.

First, Hayne's testimony makes clear that he did not solely rely on the testimony of Charles Edwards. At trial, Hayne stated that he derived his opinion in part from Edwards' testimony but that he also relied on a number of other sources in making his conclusion. These sources included Dr. Bratley's autopsy reports written in July 1964, video footage of the recovery of the body taken in July 1964, interviews of divers conducting the recovery effort, FBI reports, and photographs of physical evidence.

Second, the Court in Daubert makes it clear that experts are permitted wide latitude in choosing what data they rely on in forming their opinions, including those that are not based on first hand knowledge or observation. Id. Moreover, Fed. R. Evid. 703 contemplates that an expert may base his opinion

on facts or data presented at trial.[10]  Thus, Hayne's incorporation of Edwards' testimony into his analysis and opinion was not improper.  See also Carter v. Massey-Ferguson, 716 F.2d 344, 349–50 (5th Cir. 1983) (expert witness's opinion testimony based solely on plaintiff's account of accident in testimony at trial was properly admissible).

Furthermore, Seale was given every opportunity to challenge Hayne's opinion.  Hayne's ultimate conclusion regarding Dee and Moore's deaths was that they were consistent with freshwater drowning; however, he recognized that the decayed condition in which the bodies were found and the lack of soft tissue available for analyses precluded a definitive conclusion.  Given the lapse of time between the victims' deaths and autopsies and Hayne's testimony, Hayne's inability to provide a definitive conclusion provided Seale with ample material for cross-examination.  Indeed, the record reflects that counsel conducted a vigorous cross-examination of Dr. Hayne.  Additionally, the defense was permitted to call its own expert to testify about the causes of death of Dee and Moore.  Finally, the judge instructed the jury on the proper weight it should afford expert testimony.  See also Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but

---

[10] FED. R. EVID. 703 states:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

(emphasis added).

admissible evidence.") (internal quotations and citations omitted). For these reasons, we are satisfied the district court did not abuse its discretion in admitting Hayne's opinion testimony concerning the cause of death of Dee and Moore.

V.

Seale argues next that the district court erred in refusing to allow his counsel to call as a witness Edwards' attorney Walter Beasely.

The testimony of Edwards, a participant in the disappearances of Dee and Moore, was central to the Government's case against Seale. Although Edwards had denied having any knowledge of the crime for more than forty years, in 2006 the Government obtained a statement from Edwards stating that Seale had admitted details of the murders to Edwards. The Government then entered into a plea agreement with Edwards and he testified at Seale's trial.

Following Edwards' testimony at trial, Seale attempted to call Edwards' attorney, Walter Beasley, to testify that Edwards had recanted the 2006 statement he gave to the FBI and thereby impeach Edwards' testimony. After a hearing, the district court refused to permit Beasley's testimony on grounds that it would violate the attorney-client privilege. Seale challenges that ruling, arguing that Edwards waived his attorney-client privilege.

"The application of the attorney client privilege is a question of fact, to be determined in light of the purpose of the privilege and guided by judicial precedents." United States v. Neal, 27 F.3d 1035, 1048 (5th Cir. 1994) (internal quotation marks omitted). The clearly erroneous standard of review applies to the district court's factual findings and we review the district court's evidentiary rulings for an abuse of discretion. United States v. Campbell, 73 F.3d 44, 47 (5th Cir. 1996) (citations omitted). We review the application of the controlling law de novo. Id. at 46.

Seale produced no evidence that would support a conclusion that Edwards expressly waived the privilege. Seale also argues that Edwards implicitly waived the privilege.

Resolving a claim of implied waiver of the attorney-client privilege depends on the affirmative answers to two questions. United States v. Woodall, 438 F.2d 1317,1324 (5th Cir. 1970) (en banc). The first question is subjective: does the person holding the right to claim the privilege intend to waive it? Id. The second question is objective: is it fair and consistent with the assertion of the claim or defense being made to allow the privilege to be invoked? Id.

In order to satisfactorily answer the first question, the evidence must support a finding that Edwards, the holder of the privilege, intended to waive it. Seale relies on the following facts from the record to support his implied waiver claim. After Edwards gave his statement to the FBI stating Seale admitted participation in the kidnaping and murders, Edwards allegedly told Beasley the statement was false and Beasley allegedly reported this assertion to Seale's counsel. Beasley further allegedly told Seale's counsel that Edwards asserted that Edwards had no personal knowledge about Seale's involvement in the crime. Counsel for Seale then represented that at their request Beasley again talked to Edwards about the whereabouts of a potential witness and co-conspirator Curtis Dunn, and that Beasley called counsel back with the requested information. Seale argues that when Edwards furnished this information to Seale's counsel this satisfies the first prong under Woodall: Edwards knew that his attorneys were talking to Seale's counsel and therefore he intended to waive the privilege. In a hearing before the trial court, however, Beasley flatly denied that Edwards ever gave Beasley permission to speak to Seale's counsel. He also denied that Edwards ever repudiated the statement he gave to the FBI.

The district court then told defense counsel that before it would permit counsel to question Beasley, Edwards would have to be recalled about whether he was waiving his attorney-client privilege. The defendant declined the court's invitation to recall Edwards. The court explained: "I have no testimony from Edwards that he waived the attorney-client relationship. This witness here [Beasley] says that he did not."

Even if we assume that Edwards knew that his counsel Beasley was talking to Seale's counsel about Dunn's whereabouts or other matters peripherally related to the case, this fact is insufficient to establish that Edwards intended to waive his privilege regarding confidential communication. Edwards did not personally disclose any confidential information to Seale's attorney and this is usually the proof required to establish intent to waive the privilege. See In Re Grand Jury Subpoena, 341 F.3d 331, 337 (4th Cir. 2003) (citations omitted) ("As a general rule, implied waiver of [attorney-client privilege] occurs when the party claiming the privilege has made any disclosure of a confidential communication to any individual who is not embraced by the privilege. Such a disclosure vitiates the confidentiality that constitutes the essence of the attorney-client privilege.") (emphasis added).

The district court did not err in finding that Edwards did not intend to waive the privilege. It gave Seale the opportunity to establish this fact by recalling Edwards, which Seale declined to do. We find no error in the trial court's exclusion of Beasley's testimony.[11]

---

[11] Even if Edwards had waived his attorney-client privilege, it is doubtful that Beasley's testimony was admissible to impeach Edwards. "It is well-settled that evidence of a prior inconsistent statement is admissible to impeach a witness." United States v. Devine, 934 F.2d 1325, 1344 (5th Cir. 1991). However, "[p]roof of such a statement may be elicited by extrinsic evidence only if the witness on cross-examination denies having made the statement." Id.; see also FED. R. EVID. 613(b) ("Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require."). The defendant in this case failed to elicit a prior

## VI.

## A.

Seale argues next that the court erred in admitting six items of evidence over his objection. Because Seale timely objected, we review the district court's evidentiary rulings for abuse of discretion. United States v. Guerrero, 169 F.3d 933, 943 (5th Cir. 1999).

The six items of evidence at issue are as follows:

1.      Franklin Advocate newspaper article

The district court admitted an article published in a Franklin County newspaper written by Seale. In this editorial, Seale condemns the Civil Rights Bill, stating that the Bill "is nothing less than a giant step to communist dictatorship." The article also contains racially inflammatory content.

2.      Testimony of Robert Middleton

Robert Middleton was a Southern Baptist minister at the church Seale attended. At trial, he testified about contacts with Seale. In particular, Middleton recounted conversations with Seale and another man in which they threatened to kill "niggers." He testified about another instance when Seale arrived at his home with a shotgun and asked, "What do you think would happen if I walked in a nigger juke joint and just started shooting all the way around the room." Middleton further testified that once Middleton had made clear his opposition to his congregation's outward hostility to the Federal Government and African Americans, he was ostracized and feared that Seale would harm him.

3.      Testimony of Linda Ann Luallen

---

inconsistent statement from Edwards regarding recantation of his written statement and Seale has not shown how the extrinsic evidence of Beasley's statement could be admitted.

Linda Luallen was Seale's former daughter-in-law.  She testified as to Seale's open racial hostility toward African-Americans and about Seale's pride in his membership in the KKK.

4.    Testimony of Dan Irby

Irby, a friend of Seale's son, testified about Seale's statements declaring his membership in the KKK.  Irby also testified that Seale had told him that he was a Constable in Franklin County, Mississippi, a position which gave Seale "a license to kill" in Franklin County.

5.    Journal of Reverend Clyde Briggs and

6.    Testimony of Chastity Briggs-Middleton

Reverend Clyde Briggs' journal was introduced to corroborate Edwards' account of the events surrounding the kidnaping of Dee and Moore.  According to Edwards' testimony, after Dee and Moore had been tied to a tree and beaten, they told Seale and his co-conspirators that a gun cache had been hidden at the Roxie Baptist Church.  Edwards and others went to search the church for weapons.  Briggs was the minister at Roxie Baptist Church and was present that night when Edwards and others arrived looking for the guns.  Following Edwards' search of the Church, Briggs documented these events in his journal.

To further corroborate the authenticity and credibility of the journal, Chastity Briggs-Middleton gave testimony regarding her own recollection of the events described in the journal.

B.

Seale argues that none of the above evidence has any relevance to kidnaping, the crime with which he was charged.  Additionally, he contends that whatever relevance the evidence has is substantially outweighed by its prejudicial effect and that any evidence describing his acts should have been excluded as a prior or subsequent "bad act."  Finally, Seale urges that all the evidence, in aggregate, put him on trial not for the charged crimes but for all of

the ills of racial oppression that existed throughout the South. The Government maintains that the newspaper article and the testimony regarding Seale's racial animus were relevant because they were probative of Seale's racial animus, membership in the KKK and relationship to other members of the conspiracy. With respect to Briggs' journal, the Government argues, his account was probative of the search for firearms at the Church–a key fact to establish the sequence of events of the crime. Further, the additional pages from the journal and Chastity Briggs-Middleton's testimony were necessary to authenticate and corroborate the journal's entries.

The trial court is afforded wide discretion in assessing the relevance and prejudicial effect of evidence. United States v. Brown, 547 F.2d 1264, 1266 (5th Cir. 1977). Relevant evidence is admissible. FED. R. EVID. 402. Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." FED. R. EVID. 403. Additionally, Rule 404(b) prohibits evidence of other acts to prove the defendant later acted in conformity with the earlier acts. FED R. EVID. 404(b). However, the rule permits other-acts evidence "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ." Id. This court applies a two-step test in evaluating the admissibility of extrinsic act evidence: (1) it must be relevant to an issue other than the defendant's character and (2) it must have probative value that is not substantially outweighed by its prejudicial effect on the jury. See United States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978) (en banc) (citation omitted).

Edwards' testimony makes it clear that Dee and Moore were abducted because of the color of their skin by a band of men who shared membership in a group hostile to African Americans and the Civil Rights movement. Therefore,

evidence related to Seale's racial animus and membership in the KKK, while racially inflammatory, was relevant to show Seale's motive and intent and to identify Seale's relationship with others in the conspiracy. See, e.g., United States v. Black, 685 F.2d 132, 134 (5th Cir. 1982) (permitting the admission of a Nazi flag into evidence despite its racially inflammatory nature when the flag was relevant to show the identity of the group committing the conspiracy).

With respect to the admission of Reverend Briggs' journal in which he described the search of the Roxie Church, Seale argues that the journal in general was irrelevant and that three pages in particular were unduly prejudicial because they recounted instances of racial hostility unrelated to Seale. The court did not abuse its discretion in admitting the journal. The journal was admitted in its entirety so that the jury could evaluate the journal's authenticity and credibility by comparing the handwriting, writing style, and content of those other entries to the ones being offered in connection with this case. See Advisory Committee's Note to FED. RULE OF EVID. 901(B)(4) ("The characteristics of the offered item itself, considered in the light of circumstances, afford authentication techniques in great variety. Thus a document or telephone conversation may be shown to have emanated from a particular person by virtue of its disclosing knowledge of facts known particularly to him."). Additionally, the court did not abuse its discretion in admitting the testimony of Reverend Briggs' daughter, Chastity Middleton-Briggs; her testimony was relevant to corroborate the incidents described in the journal.

Furthermore, for each piece of evidence at issue on appeal, the record indicates there was a hearing where the relevance of the proffered evidence was weighed against its possible prejudicial effect. Additionally, at Seale's request, the district court gave the jury a limiting instruction that Seale was "not on trial for any act, conduct or offense not alleged in the indictment." As to the unrelated incidents of racial violence contained in the Journal, the district court provided

a limiting instruction to the jury that "the Government does not allege that the defendant here had anything whatsoever to do with those matters." And again, at the close of all the evidence, the court admonished the jury not to "make any adverse inference whatsoever against the defendant relative to those matters." See United States v. Sanders, 343 F.3d 511, 518 (5th Cir. 2003) ("[W]hen the court issues a limiting instruction, it minimizes the danger of undue prejudice.")

Therefore, the district court did not abuse its discretion in admitting the above evidence.

## VII.

Finally, Seale argues that the evidence was insufficient to support the verdict. At the close of all of the evidence at trial, Seale moved for a judgment of acquittal under FED. R. CRIM. P. 29. The district court denied Seale's motion. In reviewing the sufficiency of the evidence, we view the evidence and all inferences to be drawn from it in the light most favorable to the verdict to determine if a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. United States v. Broussard, 80 F.3d 1025, 1030 (5th Cir. 1996). Our review of the sufficiency of the evidence is "highly deferential to the verdict." United States v. Harris, 293 F.3d 863, 869 (5th Cir. 2002). "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence." United States v. Bermea, 30 F.3d 1539, 1551 (5th Cir. 1994).

In support of his argument that the evidence to convict him was insufficient, Seale contends that Edwards' testimony, essential to the Government's case against Seale, was not credible. He maintains that Edwards' claim of firsthand knowledge that Seale was connected to the kidnaping and deaths of Dee and Moore is not to be believed. Seale also argues Edwards'

testimony that Seale crossed state lines, an element of the crime for which Seale was indicted and convicted, was also incredible.

"It is the sole province of the jury, and not within the power of this Court, to weigh conflicting evidence and evaluate the credibility of witnesses." United States v. Ivey, 949 F.2d 759, 767 (5th Cir. 1991).[12] Seale argues that Edwards lacked credibility because, until Edwards agreed to testify for the Government, Edwards persistently denied having any knowledge of the events surrounding the murders of Dee and Moore. Yet the trial judge gave Seale's attorneys every opportunity to cross-examine Edwards. The record reflects that on cross-examination, counsel for Seale elicited all the facts and circumstances surrounding Edwards' receipt of immunity and a detailed account of Edwards' previous inconsistent statements about the crime. It was within the jury's province to balance Edwards' testimony elicited on direct examination with Edwards' earlier inconsistent statements along with his grant of immunity and to determine the extent to which it would accept his testimony.[13]

Testimony is incredible as a matter of law only if it relates to facts that the witness could not have possibly observed or to events which could not have occurred under the laws of nature. United States v. Bermea, 30 F.3d at 1552. According to his testimony, Edwards aided Seale in abducting and beating Dee and Moore. Before he left Dee and Moore, Edwards testified that Seale's father told him that Dee and Moore "would be took care of" which Edwards understood

---

[12] See also United States v. Cantu, 876 F.2d 1134, 1137 (5th Cir. 1989) (explaining that a witness' credibility, like the testimony of any witness, is subject to the crucible of cross-examination and is within the exclusive province of the jury); United States v. Bermea, 30 F.3d 1539, 1552 (5th Cir. 1994) ("We have repeatedly stated that the jury is the final arbiter of the credibility of witnesses.") (citations omitted).

[13] See also United States v. Bermea, 30 F.3d at 1552 ("Although the credibility of witnesses who receive consideration in exchange for their cooperation or testimony may suffer from that fact, we have concluded that it is up to the jury to evaluate the credibility of a compensated witness.") (citations and internal quotations omitted).

as meaning that Dee and Moore would be killed.  Finally, Edwards recounted how after the killings had taken place, Seale related to him both the place and the manner in which Dee and Moore were killed.  Because he personally observed the events about which he testified, Edwards' testimony is not incredible as a matter of law.

As discussed above, Edwards' testimony about Seale's role in the kidnaping of Dee and Moore—the manner in which the men were taken, the route by which they were brought to their deaths—is corroborated by other evidence presented at trial.  When we view all the evidence in the light most favorable to the verdict, a reasonable jury could easily conclude that Seale conspired to unlawfully kidnap Henry Dee and Charles Moore, and transport Dee and Moore in interstate commerce for the purposes of interrogation and assault.  Accordingly, we reject Seale's invitation to overturn the jury's verdict on sufficiency of evidence grounds.

## VIII

For these reasons, we affirm Seale's conviction.

AFFIRMED.

DeMOSS, Circuit Judge, concurring in part and dissenting in part:

I am in substantial agreement with the panel majority's resolution of most issues raised on appeal by James Ford Seale. However, I believe that the statute of limitations ran long before Seale was indicted in 2007. I also believe that the district court's admission of Seale's inculpatory statement to FBI agents, which was elicited in police custody without a Miranda warning, was reversible error. On these two points, I dissent.

I.

I first wish to reiterate my view that this prosecution is barred by the statute of limitations for the reasons stated in the first, unanimous opinion of this panel. See United States v. Seale, 542 F.3d 1033 (5th Cir. 2008). The panel's decision was vacated by a 9–8 vote to take the case en banc. 550 F.3d 377 (5th Cir. 2008). On en banc consideration, the court divided equally, 9–9, resulting in the summary affirmance of the district court. 570 F.3d 650 (5th Cir. 2009). Unfortunately, there is no final word regarding how courts are to determine the limitations period applicable to pre-1968 kidnapings. Confusion will continue to reign on whether changes to penalties retroactively affect limitations periods and how the federal saving clause affects statutes of limitations. The rigamarole of litigation in the district court, a three-judge panel of this court, an eighteen-judge en banc court, and a question certified by a 12–6 vote to the United States Supreme Court has produced ample heat but shed little light on these important legal issues. United States v. Seale, 577 F.3d 566 (5th Cir.) (certifying limitations question pursuant to 28 U.S.C. § 1254(2) and Supreme Court Rule 19), question dismissed, 130 S. Ct. 12 (2009); see also 130 S. Ct. at 12 (statement of Stevens, J., joined by Scalia, J.) ("This certificate presents us with a pure question of law that may well determine the outcome of a number of cases of ugly racial violence remaining from the 1960s."). Clarity in this area is still much-needed.

II.

Seale's conviction cannot stand because the district court committed reversible error in admitting the statement Seale made to FBI agents on November 6, 1964.

A.

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court held that statements made by the accused in custodial interrogation are inadmissible against the accused unless he is first informed of his right to remain silent, his right to counsel, his right to have counsel appointed, and that any statement made to law enforcement can be used against him.  Id. at 444.  The Court emphasized that this rule arose from the need to protect an individual's Fifth Amendment right against compelled self-incrimination via a robust application of the exclusionary rule.  Id. at 457.  This applies whether or not the individual knew of such right.  See id. at 468 ("The Fifth Amendment privilege is so fundamental to our system of constitutional rule and the expedient of giving an adequate warning as to the availability of the privilege so simple, we will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given.").

Miranda itself did not address whether its rule applied retroactively or prospectively only.  However, one week after its decision in Miranda, the Court issued Johnson v. New Jersey, 384 U.S. 719 (1966).  The petitioners in Johnson v. New Jersey were tried and convicted based on confessions elicited without Miranda warnings, and the convictions became final before Miranda was decided.  Id. at 725-26.  In unambiguous terms, the Court held that "Miranda applies only to cases in which the trial began after the date of our decision one week ago."  Id. at 721.  The rule did not apply "retroactively," that is, to convictions which were already final, nor did it apply to cases tried before Miranda's effective date.  Id. at 731-32.  However, even for statements elicited

pre-Miranda, the rule would henceforth apply "to persons whose trials had not begun as of June 13, 1966." Id. at 734; see also Frazier v. Cupp, 394 U.S. 731, 738 (1969) (holding, on collateral review, that Miranda rule did not apply to confession because petitioner was tried before Miranda decision). Since Johnson v. New Jersey and Frazier, no Supreme Court decision has applied or revisited this rule.

Prior to Miranda, fewer safeguards existed to protect the rights of arrestees. In Haynes v. Washington, 373 U.S. 503 (1963), the Court invalidated a conviction because "the petitioner's written confession was obtained in an atmosphere of substantial coercion and inducement created by statements and actions of state authorities." Id. at 513. The petitioner had been held incommunicado, his requests to see a lawyer and to speak to his wife were denied, and the police refused to present the petitioner to a magistrate unless he signed a written confession. Id. at 509-11. The Court held that "under a totality of circumstances" the facts "evidenc[ed] an involuntary admission of guilt" which deprived the petitioner of his right to due process under the Fourteenth Amendment. Id. at 513-14. The due process/voluntariness standard is fact-dependent. See id. The Court reasoned that "the fact that a defendant is not reminded that he is under arrest, that he is not cautioned that he may remain silent, that he is not warned that his answers may be used against him, or that he is not advised that he is entitled to counsel" were all relevant to the question of voluntariness; however, such facts were not necessarily determinative. Id. at 516-17. It was not until Miranda that warnings of this nature became a mandatory feature of custodial interrogation.

Miranda marked a watershed moment concerning the rights of the accused. In Dickerson v. United States, 530 U.S. 428 (2000), the Court made pellucid that the Miranda warning is not mere prophylaxis for the Fifth Amendment right against self-incrimination. The warning had become "part of

our national culture," and comprised a constitutional right in and of itself. Id. at 443-44.[1] However, the Miranda rule, rooted in the Fifth Amendment's guarantee against compelled self-incrimination, did not supplant the Court's previously articulated due process/voluntariness standard. See id. at 434 ("We have never abandoned this due process jurisprudence, and thus continue to exclude confessions that were obtained involuntarily."). It is possible that self-incriminating statements elicited in conformance with Miranda may be deemed inadmissible because they were compelled. See id. at 444 (citing Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984)).

B.

In 2007, more than four decades after Miranda and Johnson v. New Jersey were rendered, the government indicted James Ford Seale on one count of conspiracy to kidnap and two counts of kidnaping Henry Dee and Charles Moore. See 18 U.S.C. § 1201. According to a motion to suppress filed by Seale on March 22, 2007, the government "produced in discovery an FBI report alleging that defendant Seale made an inculpatory statement during the time he was in custody."[2] Seale had been arrested on a Mississippi magistrate's warrant in conjunction with his suspected role in the murders of Dee and Moore by the Mississippi Highway State Police ("MHSP") in the early morning hours of November 6, 1964.[3] The FBI report, which was dictated and memorialized by

---

[1] In Dickerson, the Court considered whether 18 U.S.C. § 3501 legislatively overruled Miranda. Congress enacted § 3501 after Miranda to make voluntariness the controlling standard for the admissibility of confessions. "The Court reasoned that, because Miranda was constitutionally based, Miranda's requirements could not be avoided by statutorily allowing the admission of unwarned statements." United States v. Guanespen-Portillo, 514 F.3d 393, 400 (5th Cir. 2008) (citing Dickerson, 530 U.S. at 444).

[2] From the time of indictment to the present, the Federal Public Defender for the Southern District of Mississippi has been Seale's appointed counsel.

[3] The murder charges against Seale under state law were later dismissed, ostensibly for lack of evidence.

Special Agent Edward Putz on November 6, 1964, the day of Seale's arrest, reads

as follows (the names of the arresting MHSP officers were redacted):

> At 5:10 a.m. on November 6, 1964, JAMES FORD SEALE was apprehended on the charge of murder by [redacted]. Special Agents EDWARD JOHN PUTZ and LENARD A. WOLF were present at the apprehension.

> Special Agents PUTZ and WOLF accompanied [redacted] in transporting JAMES FORD SEALE to Jackson, Mississippi.

> En route to Jackson, JAMES SEALE answered general questions not pertaining to the murders. He remained mute at direct questions that were asked him about the murders with the following exception which is set out here verbatim:

> SA WOLF: We know that on Saturday afternoon May 2, 1964, you picked up in your car HENRY DEE and CHARLES MOORE, two Negro boys from Roxie. You and CHARLES EDWARDS and others took them to some remote place and beat them to death. You then transported and disposed of their bodies by dropping them in the Mississippi River. You didn't even give them a decent burial. We know you did it, you know you did it, the Lord above knows you did it.

> JAMES SEALE: Yes, but I'm not going to admit it; you are going to have to prove it.

> When questioned further regarding this remark he said "I'm not going to say anything more".

> [Redacted] all heard the above conversation. SA PUTZ noted that the time that SEALE made the above statement was at 5:40 a.m.

Seale asserted in the motion to suppress in 2007 that, "[a]t the time the

statement was made, Defendant had not been properly advised of his right to

remain silent and his right to have an attorney appointed to represent him."

Seale also argued that he "was subjected to physical abuse by the officers and

agents questioning him," and that the FBI agent questioning him used the

psychologically coercive "Christian Burial Speech." See Brewer v. Williams, 430

U.S. 387 (1977). Seale filed a separate memorandum of points and authorities,

which stated in part: "At the time the statement was made, the United States

Supreme Court had not yet issued their famous opinion in the case of Miranda
. . . ." The memorandum did not cite Johnson v. New Jersey, but rather, argued
that Seale's statement was inadmissible under the voluntariness standard of
Haynes v. Washington.

The government responded to Seale's motion on April 16, 2007. It also
argued that the voluntariness standard of Haynes v. Washington applied.
However, the government specifically averred that the Miranda rule did not
apply, and for the first time, cited Johnson v. New Jersey. I feel it necessary to
draw attention to the following passage from the government's response:

> Defendant appears to recognize that Miranda v. Arizona, 384 U.S.
> 436 (1966), was not decided until two years after Seale made the
> admission in this case, and that the procedural safeguards afforded
> by that decision are therefore not applicable here. Johnson v. New
> Jersey, 384 U.S. 719, 732 (1966) (holding Miranda decision does not
> apply retroactively); Frazier v. Cupp, 394 U.S. 731, 738 (1969)
> (same). Although the defendant does not suggest that Miranda
> applies in this case, he inaccurately asserts that a Supreme Court
> decision three years prior to Miranda imposed a requirement that
> "defendants must be properly advised of their right to remain
> silent." Defendant's Motion to Suppress at 2. In fact, that prior
> decision, which governs the admissibility of Seale's 1964 statement,
> requires a reviewing court to examine the totality of the
> circumstances concerning the interrogation when determining
> whether a defendant's statement is "voluntary." See Haynes v.
> Washington, 373 U.S. 503, 514 (1963).

Thus, the government first cited Johnson v. New Jersey, and affirmatively stated
that Seale was not entitled to the protections and benefits of the Miranda
decision, notwithstanding the fact that trial would begin over forty years after
Miranda became applicable to all trials.

The district court conducted a hearing on the motion to suppress, as well
as on other pre-trial motions, from April 30 to May 2, 2007. Agent Putz, who
was long-since retired, testified that the FBI memorandum accurately recounted
the events of November 6, 1964. Putz stated that Seale never requested counsel,

but also made no further admissions. Putz testified that he never heard the arresting MHSP officers advise Seale that his statements could be used against him, nor that he had the right to an attorney and the right to remain silent. The government offered no testimony that Miranda warnings were given to Seale.

At the suppression hearing, Seale's counsel, the government, and the court all operated under the misguided assumption that Miranda did not apply to Seale's custodial confession. On April 30, Seale's counsel argued that under Haynes, the FBI agents were obligated to inform Seale of his right to counsel, his right to remain silent, and that his statements could be used against him. Seale's counsel did not discuss Johnson v. New Jersey. In response, the government stated:

> Despite counsel's protestations to the contrary, Miranda was not the law. The decision was not made until 1966. Indeed, the Supreme Court of the United States said in [Johnson v. New Jersey] and also in [Frazier v. Cupp] that Miranda does not apply retroactively. Miranda represented a demarcation. From Miranda forward there was a requirement to warn the defendant, as counsel has suggested that Mr. Seale was entitled to here.

Thus, for a second time, the government made an incorrect statement of law concerning the applicability of Miranda and the holding of Johnson v. New Jersey. The government's comments constituted the only references to Johnson v. New Jersey and the only arguments whether the protections of Miranda applied to Seale's trial. Two days after hearing evidence and argument concerning the motion to suppress Seale's statement, the district court issued an oral ruling on May 2. The court reasoned that neither Haynes nor Brewer was apposite. The court did not discuss whether it considered Miranda applicable, nor did it mention Johnson v. New Jersey and its bearing upon the Miranda decision. The court denied Seale's motion to suppress.

C.

Seale's confession was one of two pieces of evidence which placed him at the scene of the murders. The other statement came from Charles Edwards, a co-conspirator in the abduction of Dee and Moore. Edwards took part in abducting the two young men on May 2, 1964, taking them to Homochitto National Forest, beating them, and demanding to know where guns were being stored in anticipation of what the KKK supposed was a Black Panther-inspired insurrection. Once Dee and Moore stated that guns were being hidden in the baptistry of the Roxie Baptist Church, Edwards departed the scene in order to notify law enforcement and search the church. He testified that he left Seale and other KKK members with Dee and Moore, who were alive at the time. Edwards did not witness what occurred next. He stated that some four to six weeks later, he was present when James Seale described to other members of the KKK what transpired after Edwards left. Seale did not speak to Edwards directly; Edwards was present and overheard the details. According to Edwards, Seale revealed that he took Dee and Moore first to the farm of Clyde Seale (the defendant's father), and from there to Natchez, Mississippi, across the Mississippi River into Louisiana, and then a short distance north to Parker's Landing, which is in Mississippi. Dee and Moore were weighted down and cast alive by James Seale and others into the Old Mississippi River (a former arm of the river which forms the Mississippi–Louisiana border).

Edwards's statements were based entirely on forty-year-old hearsay. He could not recall precisely when, where or under what circumstances Seale disclosed the details of the transportation and deaths of Dee and Moore. Unsurprisingly, Edwards never wrote down the details of Seale's statement, and never revealed the details to another person before being compelled to testify. In fact, Edwards said he had lied about the facts or covered them up for over forty years: he lied to state and federal law enforcement agents in the 1960's; he

asserted his Fifth Amendment privilege before the House Un-American Activities Committee in 1966; he lied to a film crew from the news program 20-20 in 1999; and he lied to the victims' families. Edwards acknowledged that he continued to lie to federal officials investigating the present case. Even after he was granted immunity, stripped of his Fifth Amendment privilege, and compelled to testify, Edwards insisted that he knew nothing about what happened to Dee and Moore after he left them in the forest. He was administered a polygraph examination and was informed that he had failed the portion of the examination pertaining to what happened after he left the forest. Edwards testified that the government threatened to question his family and charge him with perjury. At this point, for the first time in over forty years, Edwards divulged what he remembered about Seale's inculpatory statements about killing Dee and Moore.

Seale's confession, though far more succinct than Edwards's testimony, played a very prominent role in securing his conviction. On the sixth day of trial, June 12, 2007, the government called FBI Special Agent Putz as its final witness and elicited the facts and circumstances of the confession. The government then relied heavily upon it during the rebuttal portion of its closing argument. In fact, Seale's one-sentence confession was the fulcrum of the government's final words to the jury in this case. At the outset of rebuttal, the prosecutor stated[4]:

> Ladies and gentlemen, let me tell you about one man's words: 'Yes. But I'm not going to admit it. You're going to have to prove it.'

> Those are the words of a guilty man. Defiant, arrogant, and unrepentant. Cocksure and confident that he would never be seated in a courtroom like he is here today. Confident that the crime that he committed was never going to be discovered. And he was

---

[4] The following passages are found in Volume 11 of the trial transcripts.

confident, ladies and gentlemen, and he was defiant and he was cocksure because he was able to pick the participants in this conspiracy, because he was able to pick the members that he committed this crime with, because the people that he committed this crime with were his fellow Klansmen, his father, his brother, his life-long family friend. And he was confident that none of them were ever going to come in and tell ladies and gentlemen of a jury like yourselves what he had done.

And he knew something else too back when he made that statement to the FBI in 1964. He knew that local law enforcement, at least some members of it, in Franklin County, Mississippi, were a help to this conspiracy, not a hindrance.

Thus, the jury was urged to regard Seale's custodial confession as the most telling statement any person made at or around the time of the kidnap-murders.

The prosecutor then discussed other relevant evidence, mainly the testimony of Charles Edwards. Returning to the confession, the prosecutor implied that it was given without coercion or physical intimidation:

But now I want to go back to the beginning, because there is still one other very important corroboration for the testimony of Charles Edwards: 'Yes, but I'm not going to admit it. You're going to have to prove it.' The uncontroverted testimony from Agent Putz is that this is the testimony – that was the statement made by this defendant to two FBI agents back in 1964, a statement made approximately 30 minutes after he was arrested, while he was in the backseat with those two agents.

You saw Agent Putz on the stand. You had an opportunity to evaluate his credibility. You ask yourself whether or not that struck you as an agent who beat a confession out of this man.

A few minutes later, the prosecutor again beseeched the jury to convict Seale on the weight of the confession:

I submit to you also that the very defiant, arrogant, confrontational statement that the defendant made undercuts any argument as to its voluntariness or to its credibility.

46

And make no mistake, ladies and gentlemen, this was a confession. Agent Putz was there. He told you the defendant's demeanor. He told you what happened in that car. He knows a confession when he hears one. . . . [Seale] was basically confronted with the fact that he had committed this murder, and his statement in response was "yes."

. . . .

This man issued a challenge 43 years ago, back when he was a young man, back when he was confident that nothing was going to happen to him for his participation in this crime. He thought that his secret was safe and that the silence was going to be permanent. But we have finally taken up that challenge here in court during the last two weeks.

Shortly thereafter, the prosecutor concluded rebuttal. The jury found Seale guilty on all counts.

D.

In the opening brief in this court, Seale's counsel stated: "The alleged confession occurred before the Supreme Court decided Miranda. This Court must therefore rely on pre-Miranda case law to determine the applicable test for a claim of involuntary confession." Seale's brief did not cite Johnson v. New Jersey. In its response brief, the government admitted for the first time that Miranda should have applied to Seale's trial. The government then asserted that because Seale's counsel "affirmatively argued to the district court, and continues to argue on appeal, that the admissibility of his 1964 statement is governed by pre-Miranda standards of voluntariness, the issue of whether his statement should have been excluded under Miranda is waived." In his reply brief, Seale argued that he adequately raised the issue whether the statement should be suppressed, and that a collective mistake on the part of the prosecution, defense, and district court should not deprive Seale of the benefit of the proper legal standard.

### III.

In my view, Seale has preserved the argument that the lack of Miranda warnings rendered his confession inadmissible. Alternatively, if review is for plain error, I believe such is present. In either case, I would reverse.

### A.

The panel majority first acknowledges that the facts in this case are "egregious." I agree, but I part ways where the panel majority lays all responsibility at Seale's feet for his counsel's errors. The majority considers this an instance "where an appellant affirmatively misleads the court regarding the legal standard that controls the objection." There are two problems with this statement. The first is legal. Miranda did not overrule or supplant the voluntariness test. Miranda is grounded in the Fifth Amendment's guarantee against compelled self-incrimination. The Miranda rule supplements, or subsumes in part, the voluntariness inquiry, which has its roots in due process. An un-Mirandized statement may be voluntary; conversely, an involuntary, coerced statement may follow a scrupulous recitation of the Miranda warnings. See Dickerson, 530 U.S. at 444. Thus, the panel majority mistakenly treats pre- and post-Miranda paradigms as mutually exclusive.

Secondly, I do not think it proper to blame only Seale for the error. Seale's counsel noted in the motion to suppress that, prior to giving the statement, Seale "had not been properly advised of his right to remain silent and his right to have an attorney appointed to represent him." However, the government stated in opposition that, under Johnson v. New Jersey, the "Miranda decision does not apply retroactively."[5] The government continued to unqualifiedly and

---

[5] The government was, at best, half-right. Johnson v. New Jersey indicated that Miranda did not apply "retroactively" to convictions which had become final, nor to cases on direct appeal, as of June 13, 1966. 384 U.S. at 730-34; see also Frazier, 394 U.S. at 738 (same).

vociferously urge this incorrect position until after Seale filed his opening brief in this Court. Had the government, Seale's counsel, or the court read Johnson v. New Jersey, the falsity of the government's statements would have been immediately apparent. There was ample time to peruse Johnson v. New Jersey after the government cited the decision in its response to Seale's motion. The government cited Johnson v. New Jersey again during oral argument for the motion to suppress, and the district court did not rule on the motion for two more days. I consider this deficient lawyering, for which Seale's counsel is primarily responsible. However, the district court had to accept the government's representations at face value in order to deny the motion to suppress. The panel majority ignores the government's role in misleading the court and only concludes that "Seale's affirmative misrepresentation of the correct standard did more than fail to alert the court to the proper standard, it affirmatively led the court into error." Respectfully, I submit that this assertion by the panel majority distorts critical facts.

B.

Whether a district court grants or denies a motion to exclude or suppress evidence, we review factual findings for clear error and conclusions of law de novo. United States v. Pope, 467 F.3d 912, 915-16 (5th Cir. 2006) (citations omitted). To preserve error, Federal Rule of Evidence 103(a)(1) requires that a litigant first file a motion which states "the specific ground of objection, if the specific ground was not apparent from the context." To be reviewable, the error must affect a substantial right of the party. Id. "Nothing in this rule precludes

---

However, even a cursory review of Johnson v. New Jersey permits but one reading: the Miranda rule would apply "to persons whose trials had not begun as of June 13, 1966." 384 U.S. at 734.

taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court." FED. R. EVID. 103(d).

"In determining the sufficiency of objections we apply 'the general principle that an objection which is ample and timely to bring the alleged . . . error to the attention of the trial court and enable it to take appropriate corrective action is sufficient to . . . preserve the claim for review.'" United States v. Williams, 985 F.2d 749, 755 (5th Cir. 1993) (ellipses in original) (quoting Osborne v. Ohio, 495 U.S. 103, 125 (1990)); see also Douglas v. Alabama, 380 U.S. 415, 422 (1965). If an argument is not raised in a motion to suppress, it is deemed forfeited, and we review for plain error. See United States v. Baker, 538 F.3d 324, 329 (5th Cir. 2008).[6] However, where good cause is shown, the "court may grant relief from the waiver." FED. R. CRIM. P. 12(e); cf. United States v. Hall, 565 F.2d 917, 920 (5th Cir. 1978) (holding that "district court's desire to avoid penalizing a criminal defendant for the inadvertence of his attorney constitutes 'cause'").

Seale never affirmatively argued that Miranda applied to his case. However, he asserted that he had not been advised of his right to remain silent or have counsel appointed. These factual allegations should have suggested to the court that the absence of prophylactic warnings in conformance with Miranda was relevant to this case. In Douglas, trial counsel objected that the reading of a confession by the defendant's confederate was "not subject to cross-examination." 380 U.S. at 421 n.4. The Court held that this sufficed to preserve a Confrontation Clause challenge. Id. at 423. Counsel need not provide crafted

---

[6] There is conflicting authority from other circuits concerning whether arguments not raised are truly "waived"—and are thus unreviewable—or merely "forfeited," and therefore subject to plain-error review. See id. at 328-29 & nn. 1-6. Our practice has been to treat such arguments as forfeited, and thus to review for plain error. See id. at 329.

legal arguments, but rather, must notify the court of the nature of the objections. See United States v. Harrelson, 705 F.2d 733, 738 (5th Cir. 1983) ("Hearings on motions to suppress are . . . designed for the presentation of evidence in support of factual allegations which, if proven, would justify the relief sought."); United States v. Renteria, 625 F.2d 1279, 1283 (5th Cir. 1980) ("Involuntary confessions, about which the court is alerted, should not be admitted in evidence merely because of defense counsel's oversight or incompetence."). I believe that Seale's motion to suppress adequately stated the factual basis of a Miranda objection. Our appellate review should not be for plain error, but rather, whether the error was harmless beyond a reasonable doubt. See United States v. Joseph, 333 F.3d 587, 592 (5th Cir. 2003).[7]

This case differs significantly from those cited in the panel majority's opinion. United States v. Mejia, 844 F.2d 209 (5th Cir. 1988), involved counsel's failure to articulate a specific hearsay exception at trial; we held that the appellant could not argue the exception on appeal. Id. at 214-15. Alternatively, we held that the error, if any, was harmless. Id. at 215. Notably, Mejia did not involve an error of constitutional gravity or a misunderstanding of law perpetuated by the government.[8] Unlike the trial court in Mejia, the district court considering Seale's motion to suppress had ample time to investigate the authorities cited by the parties, including Johnson v. New Jersey, which the government relied on for the non-applicability of Miranda. The panel majority

---

[7] Even if the objection was inadequate, the government's failure to recant its misstatement of law until this appeal makes it suitable to notice the error in this tribunal. Cf. United States v. Cathey, 591 F.2d 268, 271 n.1 (5th Cir. 1979) (finding good cause for delay in motion to dismiss indictment where basis for motion was not knowable until mid-trial).

[8] The panel majority also cites United States v. Sims, 617 F.2d 1371, 1377 (9th Cir. 1980), which, like Mejia, involves hearsay exceptions which were never argued in the trial court.

also points to United States v. O'Brien, 435 F.3d 36, 38-39 (1st Cir. 2006), where counsel failed to object on the basis of Doyle v. Ohio, 426 U.S. 610 (1976), after the prosecutor wrongly made comments about the defendant's silence. Counsel objected on an incorrect basis, and a Doyle-based "objection was not obvious from context," which led the court to review for plain error only. 435 F.3d at 39. Ironically, the court reasoned that while any lawyer worth his salt would know of the Miranda rule, "many lawyers have never heard of Doyle." Id. Like Mejia and unlike the present case, O'Brien involves a ruling made on the spot during trial, and nothing suggests that affirmative misstatements of the law by the government precipitated the court's error. In sum, the present case is entirely different from the authorities marshaled by the panel majority.

Specificity in objections is desirable, but when it comes to basic constitutional guarantees, courts must hesitate before exalting form over substance. I have found no case, and the panel majority cites none, where the court holds a defendant entirely accountable for an error caused by a confluence of the government's misstatements and defense counsel's inadvertence. Following the government's citation of Johnson v. New Jersey for the unqualified but erroneous position that Miranda had no application to Seale's trial whatsoever, it appears that nobody looked into the issue. The judge was not asked to rule on the motion in the midst of trial, and two days separated the testimony of Special Agent Putz, and arguments by counsel, from the court's denial of Seale's motion. Error was predicated not by a dearth of factual averments, nor by evidence insufficient to show that Seale did not receive Miranda warnings (clearly, the evidence showed that he did not). Error was grounded in a pure misunderstanding of law, which is reviewed de novo. See Pope, 467 F.3d at 915-16.

If error was preserved, there is no question but that Seale's custodial confession was improperly admitted. See Miranda, 384 U.S. at 444. The government has not shown that the error was harmless beyond a reasonable doubt. See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); Joseph, 333 F.3d at 592. Without the confession, the jury would have had to rely on the testimony of Charles Edwards. Edwards admitted that he had lied about the details of the crime for over forty years. He continued to deny knowledge concerning the deaths of Dee and Moore after he was immunized and compelled to testify at trial. Edwards stated that he personally took part in inveigling Dee and Moore, and beating them to find out where weapons were stored. However, Edwards's first-hand knowledge ceased there. Everything from that point forward came from a statement that Seale made some time after the acts alleged. Edwards only revealed the details of this statement when the government threatened to question his family and charge him with perjury. On the whole, Edwards's testimony presented the jury with a narrative that was rife with inconsistencies, gaps, and credibility problems. Without Seale's confession, only circumstantial evidence supported Edwards's version of the events. No physical or forensic evidence connected Seale to the killings.

The government emphasized Seale's confession repeatedly during its closing argument as the boastful challenge of a "defiant, arrogant, and unrepentant" murderer. It is almost certain that this confession affected the jury's deliberations and the outcome of proceedings. See Sullivan v. Louisiana, 508 U.S. 275, 279 (1993) ("The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.") (emphasis in original). We cannot know

whether the jury considered Seale's confession relevant, or mere surplusage in light of other evidence. I would reverse.

C.

Even if plain error is the appropriate standard, see United States v. Olano, 507 U.S. 725, 733-34 (1993), I believe such is present. The burden is on Seale to meet the standard. Id. at 734-35. As the panel majority acknowledges, Seale easily meets the first two elements: "error" that is "plain" or "obvious." Id. at 734. The district court committed error by allowing Seale's confession to be admitted after Miranda became applicable to all trials. The error was obvious in light of Johnson v. New Jersey. The panel majority waffles on the third prong, whether the error affected Seale's substantial rights. See id. at 735. I believe that the erroneous admission of the confession was highly prejudicial. There is no doubt in my mind that the confession, which the government relied on heavily during closing arguments, "affected the outcome of the district court proceedings." See id. at 734. And unlike the panel majority, I believe that the court should exercise its discretion to correct the error because it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." See id. at 736 (alterations in original; quotation omitted).

I first point out that our Court has previously examined plain error in this context. In Garay v. United States, 399 F.2d 696 (5th Cir. 1968) (per curiam), defendant-appellant Garay was interrogated before Miranda was decided, and thus was not given Miranda warnings. Id. at 696.

> Appellant was implicated originally by co-defendant and government witness Villareal. Appellant and Villareal had just been on a trip to Mexico together. Villareal was found in possession of narcotics, and told government officers he was carrying them as agent of appellant and was to deliver them to appellant in Texas. No delivery was shown. Villareal's statements were used to elicit admissions from appellant. Then at the trial Villareal recanted his

54

statements implicating appellant and testified that he was attempting, in desperation and confusion, to shift blame from himself to appellant.

Id. We reasoned that Garay's improperly obtained confession was of "great importance in the totality of evidence." Id. Trial was held a few weeks after Miranda was issued; consequently, we held that admission of the statement into evidence was "plain error affecting substantial rights," notwithstanding trial counsel's failure to object. Id. We therefore vacated the conviction. Id. The panel majority has failed to cite, much less distinguish Garay.

The panel majority has assumed, but not decided, that the admission of Seale's confession was prejudicial. The confession was one of two pieces of evidence connecting Seale to the murders. Without it, the jury would have had to rely solely on forty-year-old hearsay from Charles Edwards, a co-conspirator and fellow Klan member who admittedly lied about the crime for most of his life. Edwards continued to change his story even after the government granted him immunity and compelled him to testify. Thus, the evidence of Seale's role in the death of Dee and Moore can hardly be considered overwhelming or uncontroverted. The confession was "of great importance in the totality of evidence;" its admission was highly prejudicial. See id.

The panel majority concludes that even if the error prejudiced Seale, the court should not remedy such error pursuant to its discretion under the fourth prong of plain-error analysis. It cites only Johnson v. United States, 520 U.S. 461 (1997). There, the Court reasoned that the failure to submit "materiality" in a perjury prosecution to the jury, as opposed to the judge, was plain error. Id. at 467-68. This was error only due to an intervening Supreme Court decision[9]; nevertheless, the Court reasoned that the plainness of error may be assessed at

---

[9] See United States v. Gaudin, 515 U.S. 506 (1995).

the time of appeal. Id. at 468. The Court assumed that the error affected substantial rights, but declined to correct it because the evidence was "overwhelming:" materiality was "essentially uncontroverted at trial and has remained so on appeal." Id. at 469-70. In light of overwhelming evidence, the Court reasoned that affirming would cause no miscarriage of justice. Rather, reversing the conviction on the basis of such a technicality would cause greater damage to the reputation of judicial proceedings. Id. at 470.[10]

I do not believe that Johnson v. United States is helpful to the issue before this panel. It concerned a matter which was never contested by the litigants, was manifest from the trial record, and only became a viable issue post-trial. In such circumstances, reversal based upon the fortuitous issuance of new Supreme Court authority seems a windfall to an undeserving litigant. If evidence to fill a gap created by a technical deficiency is overwhelming and uncontroverted in the first instance, and will remain so upon remand, a new trial is a wasteful formality, which might indeed rightly stoke public ire. See Johnson v. United States, 520 U.S. at 470; Cotton, 535 U.S. at 632-33.

In my view, Seale's case could not be more factually distinct from Johnson v. United States or Cotton. The admissibility of Seale's confession was contested from the outset. Aside from the prominent role the confession played in securing guilty verdicts, it bears emphasizing that it was admitted in clear derogation of

---

[10] The Court used identical reasoning in United States v. Cotton, 535 U.S. 625 (2002). There, defendants were convicted of drug offenses and sentenced to terms in excess of twenty years' imprisonment based on judge-made findings that the drug quantities triggered enhanced penalties. Id. at 627-28. After trial but before appeal, the Supreme Court issued Apprendi v. New Jersey, 530 U.S. 466, 490 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."). The Cotton Court held that failure to submit drug quantities to the jury was plain error under Apprendi, but, even assuming that it prejudiced defendants, the Court did not need to correct the error because evidence of drug quantities was "overwhelming" and "essentially uncontroverted." 535 U.S. at 632-33.

Seale's Fifth Amendment privilege against compelled self-incrimination. The Miranda Court deemed this privilege the "essential mainstay of our adversary system." 384 U.S. at 460. From and after Dickerson, see 530 U.S. at 444, it is beyond doubt that the Miranda warnings are of constitutional provenance. We must therefore be especially reticent to overlook errors of this magnitude. Cf. Olano, 507 U.S. at 735. The error did not arise due to a new decision; it pre-dated Seale's trial by at least forty years. While such timing is not relevant under the second prong of the plain-error test, see Johnson v. United States, 520 U.S. at 468, it is worth weighing when we consider the effect of a pure error of law on the "fairness, integrity, or public reputation of judicial proceedings," see Olano, 507 U.S. at 736. The panel majority cites no case from this circuit, and I have found none, which affirms a conviction after finding that the district court committed a plain, prejudicial Miranda error.

The panel majority makes virtually no effort to liken this case to Johnson v. United States; it merely cites the case as an example of an affirmance based on the fourth prong of plain error. One would be hard-pressed to glean how exactly the majority exercised its discretion to disregard the error. The majority states it is "satisfied that the Government presented a strong case of guilt." Additionally, "[w]hile the defendant's statement may have been helpful to the Government, it was certainly not the centerpiece of its case." With due respect, I take a different view of the evidence and the law. The remaining evidence discussed by the panel majority either corroborates Seale's confession or Edwards's testimony. The jury heard details about the recovery of the victims' remains, that the Roxie Baptist Church was searched for guns, and that Seale belonged to the KKK. But this evidence simply does not place Seale at the scene of the murders. Moreover, our job is not merely to excise improperly admitted evidence and ask whether the case for guilt is tenable. In my view, this

displaces the role of a properly informed jury. I disagree with the implication that, so long as the appellate court feels that the remaining, properly admitted evidence presents "a strong case of guilt," it may overlook the deprivation of virtually any substantial right. This is supported by neither the letter nor the policy behind the Supreme Court's plain-error jurisprudence. See ROGER J. TRAYNOR, THE RIDDLE OF HARMLESS ERROR 50 (1970).[11]

The majority also indicates that it declines to correct the error in part because Seale's counsel was complicit in arguing the incorrect legal standard. It is true that "Seale's counsel had the primary responsibility of marshaling the facts and law" in support of his motion to suppress. However, as I discuss above, Seale's original motion put the district court on notice of the lack of the proper warnings to Seale concerning his right against compelled self-incrimination. I

---

[11] Justice Traynor's commentary on the effect of reversing non-prejudicial error was cited by the Supreme Court in Johnson v. United States, 520 U.S. at 470, and echoed by the panel majority in this case for the following: "Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it." I find the full passage from which the quote is taken instructive:

> Appellate judges, persuaded by the record that the defendant committed some crime, are often reluctant to open the way to a new trial, given not only the risk of draining judicial resources but also the risk that a guilty defendant may go free. The very reluctance of judges to confront such risks, however, serves to condone errors that may affect a judgment and thus engenders a still more serious risk, the risk of impairing the integrity of appellate review. Nothing is gained by running such a risk and much is lost. If appellate judges forthrightly opened the way to a new trial whenever a judgment was contaminated by error, there would be a cleansing effect on the trial process. A sharp appellate watch would in the long run deter error at the outset, thereby lessening the need of appeal and retrials.
>
> Like all too easy affirmance, all too ready reversal is also inimical to the judicial process. Again, nothing is gained from such an extreme, and much is lost. Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it.

TRAYNOR, supra, at 50. Thus, Justice Traynor cautioned against resort to extremes: mechanical affirmance or reversal without careful consideration of the prejudicial effect of an error. In my view, the first paragraph cited above aptly describes the panel majority's misguided treatment of the error in this case.

reiterate that the government first (wrongly) cited Johnson v. New Jersey. From the sequence of events, one might conclude that the government took a hard line in stating repeatedly and unequivocally that Miranda had no applicability to this case. Then, after obtaining a conviction and allowing Seale's counsel to urge a misbegotten legal theory in its opening brief, the government acknowledged that it had been wrong all along. I personally impute no malice to the government. However, to condone what objectively looks like legerdemain is to turn the rule of forfeiture and the plain-error standard from doctrines which uphold the administration of justice into tools for rubber-stamping shaky convictions. It is the government's conduct in this case which more resembles the "sandbagging" that plain error review is intended to prevent. See Puckett v. United States, 129 S. Ct. 1423, 1428 (2009) (citations and quotations omitted). In light of these facts, I disagree that it would "bestir[] the public to ridicule" the judicial system to require a new trial attendant with the basic guarantees that the Constitution mandates.[12]

I feel that the panel majority has not conducted the "case-specific and fact-intensive" review that is required to deny relief under the fourth prong of plain-error review. See Puckett, 129 S. Ct. at 1433. Indeed, one must wonder whether any plain error will be corrected after this decision. If an immensely prejudicial, purely legal error affecting a fundamental constitutional right need not be fixed, what error should be?

IV.

---

[12] The possibility that the public would disapprove because guilty and innocent alike would receive new trials, or in some cases, be set free, was not apparently of overriding concern to the Supreme Court when it decided Miranda. Indeed, despite reversing his convictions, the Court never showed any doubt that Ernesto Miranda had committed kidnaping and rape. See 384 U.S. at 492 & n.66.

The clumsy handling of the Miranda issue in this case by all involved dramatically indicates one of the sound policy reasons favoring repose in statutes of limitations on criminal charges. At the time of Miranda (and Johnson v. New Jersey) in 1966, it is likely that few, if any, of the attorneys involved in this case were licensed or practicing. They would have no reason to be personally familiar with the dramatic effects of Miranda and Johnson v. New Jersey at the time those opinions were issued by the Supreme Court. Similarly, the special circumstance here, i.e., the confession occurring before Miranda but trial occurring after Miranda, was a circumstance that would have diminished in frequency with the passage of time. If the five-year statute of limitations for non-capital offenses was most frequently applied to criminal charges in the 1960's and 1970's, see 28 U.S.C. § 3282, the occasions on which a pre-1966, un-Mirandized confession would be in issue would drop off significantly by 1971. I can understand, therefore, that in Seale's indictment and trial, which occurred over forty years after Miranda and Seale's confession to FBI agents, a new generation of lawyers might never have had an occasion to be exposed to the effect of Johnson v. New Jersey on the applicability of the Miranda rule. These circumstances should not excuse a grievous misinterpretation of Johnson v. New Jersey, which led the district court into error, but rather, should compel us to demand more exacting application of the controlling law.

Our treatment of those accused of the most heinous and despicable acts is a measure by which we mark our adherence to the rule of law. Today the panel majority affirms a conviction which was derived from a trial lacking one of the most important constitutional guarantees afforded to our citizens. On the basis of the Miranda issue, and subject to my comments about the statute of limitations, I believe that this conviction cannot stand. Respectfully, I dissent.